EARNEST LEE OLIVER, APPELLANT, *v.* THE STATE
OF NEVADA, Respondent.

No. 15487

July 31, 1985                                        703 P.2d 869

*Morgan D. Harris,* Public Defender, and *Craig D. Creel,*
Deputy Public Defender, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert J.
Miller,* District Attorney, *James Tufteland,* Deputy District
Attorney, Clark County, for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

On May 7, 1983, Las Vegas policemen arrested appellant
Oliver and charged him with larceny from the person, in viola-
tion of NRS 205.270. At trial, prosecution witnesses established
the following facts.

On the night of Oliver's arrest, three policemen undertook to
conduct a "decoy operation" near the intersection of Main and
Ogden in Las Vegas. That corner is in a downtown area fre-
quented by substantial numbers of persons commonly character-
ized as "street people," "vagrants," and "derelicts." It appears
Oliver, a black man, is one of these.

Disguised as a vagrant in an old Marine Corps jacket, the decoy officer slumped against a palm tree, pretending to be intoxicated and asleep. His associates concealed themselves nearby. The decoy prominently displayed a ten-dollar bill, positioning it to protrude from the left breast pocket of his jacket. This was done, the decoy later testified, "to provide an opportunity for a dishonest person to prove himself."

Oliver, who had the misfortune to come walking down the street, saw the decoy and evidently felt moved to assist him. Shaking and nudging the decoy with his foot, Oliver attempted to warn the decoy that the police would arrest him if he did not move on. The decoy did not respond, and Oliver stepped away. Up to his point, Oliver had shown no predisposition whatever to commit any criminal act.

Then, Oliver saw the ten-dollar bill protruding from the decoy's pocket. He reached down and took it. "Thanks, home boy," he said. Thereupon, he was arrested by the decoy and the two other officers. Following the trial, a jury convicted Oliver of larceny from the person, and he has been sentenced to ten years imprisonment. This appeal followed.

Oliver's counsel contends he was entrapped into committing the offense in question. We agree. As stated in Froggatt v. State, 86 Nev. 267, 467 P.2d 1011 (1970), government agents or officers may not employ extraordinary temptations or inducements. *Id.* at 270, 467 P.2d at 1013. They may not manufacture crime. We have repeatedly endorsed the following concept:

> Entrapment is the seduction or improper inducement to commit a crime for the purpose of instituting a criminal prosecution, but if a person in good faith and for the purpose of detecting or discovering a crime or offense, furnishes the opportunity for the commission thereof by one who has the requisite criminal intent, it is not entrapment.

Moore v. State, 93 Nev. 645, 646, 572 P.2d 216, 217 (1977); *see also* In re Wright, 68 Nev. 324, 329, 232 P.2d 398, 400 (1951). Thus, because we discern several facts which we believe combined to create an extraordinary temptation, which was inappropriate to apprehending merely those bent on criminal activity, we feel constrained to reverse Oliver's conviction.

We note, first of all, that the decoy portrayed himself as completely susceptible and vulnerable. He did not respond when Oliver attempted to wake him, urging him to avoid arrest by moving to another location. Moreover, the decoy displayed his ten-dollar bill in a manner calculated to tempt any needy person in the area, whether immediately disposed to crime or not. In the case of Oliver, the police succeeded in tempting a man who

apparently did not approach the decoy with larceny in mind, but rather to help him. Even after being lured into petty theft by the decoy's open display of currency and apparent helplessness, Oliver did not go on to search the decoy's pockets or to remove his wallet.

On this record, then, we think the activities of the officers, however well intentioned, accomplished an impermissible entrapment. *See* Moore v. State, 93 Nev. at 646, 572 P.2d at 217; *see also* State v. Holliday, 431 So.2d 309 (Fla.Dist.Ct.App.), *petition for rev. granted*, No. 63,832 (Fla. 1983). The Florida court's comments in the *Holliday* case, *id.*, are noteworthy:

> There is no evidence of any prior conduct of the defendant that would have shown predisposition. There is no evidence that he was engaging in criminal activity before he took the money from the decoy. [Citations omitted.] No ready acquiescence is shown; on the contrary, the defendant's acts . . . demonstrate only that he succumbed to temptation. The record, as such, reveals that the decoy did not detect or discover, nor could he reasonably be intended to discover, the type of crime the police were attempting to prevent by the use of the decoy, i.e., robberies and purse snatchings. Indeed, lifting some money protruding from the pocket of a seemingly unconscious, drunken bum is just not sufficiently similar to either robbery or purse snatchings. Upon these facts, the decoy simply provided the opportunity to commit a crime to anyone who succumbed to the lure of the bait.

431 So.2d at 310-311.

Similarly, in the instant case, through the state's own witnesses at trail, Oliver's counsel established a *prima facie* showing that Oliver's criminal act was instigated by the state. There was no countervailing evidence whatever. *See* Hill v. State, 95 Nev. 327, 594 P.2d 699 (1979); Wyatt v. State, 77 Nev. 490, 367 P.2d 104 (1961). Accordingly, on this record, we must conclude as a matter of law that Oliver was entrapped, and we reverse his conviction.[1]

---

[1] We therefore need not consider an alternative contention of Oliver's counsel, i.e. that Oliver's ten-year prison sentence is cruel and unusual and disproportionate to his "crime." We do, however, wish to tender some data on the arguably disproportionate cost to the public of prosecutions like the instant one.

According to figures compiled by the Legislative Counsel Bureau, the average operating cost of maintaining inmates in the Nevada State Prison was the sum of $13,753 per inmate during fiscal year 1983-84. This operating cost takes no account of the initial fixed cost of constructing the facilities in which inmates are housed. Thus, the operating costs of "punishing" a citizen for a "crime" such as Oliver was enticed to commit, through 10 years imprisonment, would total $137,530. Therefore, taking into account fixed

SPRINGER, C. J., and MOWBRAY, STEFFEN and YOUNG, JJ., concur.

___

costs and expenses related to prosecution and defense, it could easily cost the public as much as $200,000 when a citizen like Oliver is afforded the "opportunity to prove his dishonesty." (The expenditure could be less if the citizen were to be housed in a minimum security facility or work release program.)