SHERIFF, WASHOE COUNTY, NEVADA, APPELLANT, v. DAVID KENNEY HAWKINS, RESPONDENT.

No. 17628

March 31, 1988                                      752 P.2d 769

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, *Timothy G. Randolph,* Deputy, Reno, for Appellant.

*David Parraguirre,* Public Defender, *John Petty,* Deputy, Reno, for Respondent.

---

## OPINION

By the Court, GUNDERSON, C. J.:

On May 27, 1986, a twenty-six-year-old black male, David Kenney Hawkins, had the night off from his job at a downtown casino in Reno. Hawkins, it appears, had been steadily and successfully employed at the casino for some time. On the evening in question, he went out to enjoy his leisure time with a white male friend and, as they walked by the corner of First and Center Streets, the two young men saw a well-dressed man lying in a doorway alcove, apparently intoxicated. Several bills protruded temptingly from a brown envelope that was dangling from the apparent drunk's back pocket. However, Hawkins and his friend continued on their way to the Brass Moose Saloon, which was nearby.

About one-half hour later, they left the drinking establishment. As they re-traced their steps, the ostensible "drunk" still lay in the alcove, apparently unconscious. Upon approaching him, Hawkins' friend jumped up and down, and made loud noises, apparently to see if the "drunk" was unconscious. Then, when the purported "drunk" remained unresponsive, Hawkins reached down and slipped the bills out of the prone man's pocket. Six police officers thereupon immediately emerged from hiding and arrested Hawkins, but promptly released his white friend. The man in the alcove had been a police "decoy." Hawkins had succumbed to "bait" planted as part of a "decoy" operation.[1]

We are advised by the prosecutor that the Reno police department had contrived the "decoy" operation under the tutelage of a young deputy prosecutor, in order to "test" how they might avoid, limit, or minimize this court's decisions in Oliver v. State, 101 Nev. 308, 703 P.2d 869 (1985), and in Moreland v. State, 101 Nev. 455, 705 P.2d 160 (1985). In the course of setting up this "test case," other persons were arrested, but only Hawkins was prosecuted. In the ensuing judicial proceedings that form the basis for this appeal, the district court granted Hawkins' petition for a writ of habeas corpus, concluding that this decoy operation could not be distinguished from the ones condemned in *Oliver* and *Moreland* and was therefore controlled by our decisions in those cases. We agree.

In our view, the decoy operation used to ensnare Hawkins is indistinguishable from those employed in *Oliver* and *Moreland, supra*—at least in any ways that justify any result more favorable to the prosecution. In each operation, a decoy officer posed as a "drunk" with money protruding from one of his pockets, appearing to be completely helpless, vulnerable and nonresponsive. In each case, it appeared from the duped defendant's conduct that, at the time of the incident, he was not disposed to criminal activity. In each case, when the defendant ultimately succumbed to temptation, he did no more than slip the exposed money from the decoy's pocket and walk away. As in *Oliver* and *Moreland,* Hawkins and his friend neither engaged in acts of violence, nor in attempts to find other valuables on the decoy's person, when they finally succumbed to the artificially created temptation. As in *Oliver* and *Moreland,* it thus appears that the decoy operation planted the idea of crime in the minds of Hawkins and his friend. The police did not uncover crime; they created it.

---

[1]In this opinion we shall from time to time refer to the brandished money as "bait," just as the record reveals the police and district attorney's office consistently alluded to it.

A close reading of the grand jury transcript reveals why the money was exposed in this decoy operation. Members of the Grand Jury repeatedly asked the prosecutor why the money was made visible. In the words of one grand juror, "you can get almost anybody to pick a hundred dollar bill off of you if you are laying there passed out." The prosecutor admitted to the grand jurors, "This is designed to get the hit."[2] In other words, as in *Oliver* and *Moreland,* the money was exposed for the express purpose of entrapping someone who might not otherwise be disposed to commit crime. In fact, the "bait" had been increased from the meager $10.00 tendered to the "sucker" entrapped in *Oliver,* up to $126.00. This hardly is a factual distinction which favors the prosecution herein.

As the cases we relied on in *Oliver* and *Moreland* point out, the format of this particular kind of decoy operation is especially troubling because it does not address any actual crime problem. In fact, before formulating this decoy operation, the police department admittedly made a survey of crimes committed in the Reno area in April and May of 1986. They counted 54 grand larcenies, 30 robberies, and 9 larcenies from the person which did not amount to robbery. Not one of the offenses thus reviewed involved an ostensibly helpless drunk with money hanging out of his pocket. Indeed, the prosecutor admitted to us during oral argument that he does not know of a single complaint ever made by a theft victim who was lying in the street with money bulging from his pockets.[3]

Unfortunately, even after taking their "survey" the police failed to focus their decoy operations in a way substantially more relevant to social realities than were the artificial temptations we condemned in *Oliver* and *Moreland.* Indeed, as noted earlier, the value of the bait was increased to $126.00, supposedly to make any theft a grand larceny, but with the result that the artificially created temptation was increased. It appears to us that this change enhanced and did not reduce the "extraordinary temptation" condemned in *Oliver* and *Moreland.*

Thus, in this case, we continue to agree with the decisions of the Florida courts to which we have previously referred with

---

[2]Another grand juror stated to the prosecutor that he could not understand, in light of our *Oliver* decision, which the prosecutor had mentioned, why the decoy team had been counseled to leave the "bait" money exposed. Instead of answering the salient question with any coherent explanation, the prosecutor offered to give the grand juror a copy of *Oliver* to read.

[3]Interestingly, too, the public defender representing Hawkins asserted during oral argument, and the prosecutor did not attempt to deny, that the police have only conducted this type of operation in the summer months, while the sidewalks are warm.

approval, and which conclude that such decoy operations constitute impermissible entrapments:

> [T]he decoy did not detect or discover, nor could he reasonably be intended to discover, the type of crime the police were attempting to prevent by the use of the decoy, i.e., robberies and purse snatchings. Indeed, lifting some money protruding from the pocket of a seemingly unconscious, drunken bum is just not sufficiently similar to either robbery or purse snatchings. Upon these facts, the decoy simply provided the opportunity to commit a crime to anyone who succumbed to the lure of the bait.

State v. Holliday, 431 So.2d 309, 310-11 (Fla.App. 1983), *citing* State v. Casper, 417 So.2d 263, 265 (Fla.App. 1982); cited in *Oliver, supra,* 101 Nev. at 310, 703 P.2d at 870.

The prosecutor has also mentioned a difference between this case and *Oliver* which he evidently believes offers the possibility of a distinction favoring the prosecution, but which in our opinion does not. In this case, we are told, one officer watched over the decoy, and communicated with him by radio. This "back-up" officer decided to whom the decoy would expose the bait, and signaled the decoy to hide it from passersby whom the "back-up" officer did not wish to tempt. In particular, the prosecutor admitted to us that the officers were seeking to ensnare persons who fit a "criminal profile" developed by the police—*i.e.,* "males between 18 and 30, who are black, white, or hispanic"— and also any other persons who, for any other reason, impressed the "back-up" officer as being "criminal types." According to the prosecutor, then, Hawkins was therefore exposed to the bait and thereafter arrested and prosecuted because he was encompassed by the "criminal profile" the police had formulated: he was black, male, and 26 years old. Interestingly, however, Hawkins' friend, a young white male, was not arrested, although he could certainly have been held as an accomplice. In any case, we feel the efforts of the Reno police in the area of social science research hardly provide a valid basis for distinguishing *Oliver* and *Moreland.*[4]

By structuring their decoy operation in the way they did— contrary to our previous rulings, and the cases therein cited, *see*

---

[4]There is nothing new, of course, about the discovery of the Reno police that young adults constitute the age-group most prone to the commission of street crime. Data compiled and analyzed long ago by academically credible social scientists establish that this nation's young adults are more prone to engage in street crime than are the middle aged and senior citizens. Nonetheless, we do not believe a legitimate inference follows that young adults should therefore be subjected to artificial temptations, in order to arrest them and, perhaps, incarcerate them until they are older.

e.g., Cruz v. State, 465 So.2d 516, 522 (Fla. 1985)—the police again failed to "cast their nets in permissible waters." The use of exposed money and a supposedly helpless, vulnerable decoy created an extraordinary temptation which resulted in the entrapment of young men who were not at the time discernibly bent on committing a crime. See Oliver, supra, 101 Nev. at 309; Froggatt v. State, 86 Nev. 267, 271, 467 P.2d 1011, 1013 (1970). As noted, Hawkins and his friend did not approach the decoy the first time they saw him. Nearly an hour later, when they saw the decoy again, they merely succumbed to the lure of the "bait." Even then, these young men did not molest the decoy in any other way. Thus, there is nothing to suggest they would have stopped at all, if the money had not been openly exposed.

Finally, although we need not ground our opinion on the fact, we wish to note that while the police arrested a number of others, only Hawkins was prosecuted. The prosecutor indicated he thought Hawkins would make the best "test case" because Hawkins had a prior arrest record. Prior arrests, of course, cannot generally be used to prove bad character. NRS 48.045(2); Yates v. State, 95 Nev. 446, 596 P.2d 239 (1979). Nonetheless, with no citation to any contrary legal authority, the prosecutor has suggested vaguely that Oliver is distinguishable from this case because Hawkins had an arrest record. This being so, he seems to say, if we will allow him to proceed to trial—and if Hawkins thereafter tries to assert that he was not criminally disposed on the night in question, but simply succumbed to the extraordinary temptation presented by the police—then in this case the trial judge might allow him to impeach Hawkins through the introduction of Hawkins' previous arrest record.

Now, of course, a purely technical refutation of the prosecutor's legally unsupported notions is that, even for rebuttal at trial, evidence of character traits would not be admissible under the Evidence Code except in specifically defined circumstances. Neither the fact that a defendant has claimed innocence, nor the fact that in so doing he has asserted entrapment, appear among those enumerated exceptions. See NRS 48.045. Furthermore, we note that by specific provision of the Code, mere arrests and convictions for misdemeanors may not ordinarily be admitted even for the limited purpose of attacking a witness's credibility. See NRS 50.095.[5] Also, it should be mentioned in passing that this court

---

[5]Conviction of a felony may be admitted to attack credibility, id., but even as to felony convictions, a trial court may properly exercise discretion to exclude such evidence. See NRS 48.035(1),(2); emphasis added.

refrained from structuring any judicially created exception to these provisions of the Evidence Code, when we decided the . *Oliver* case—in which the defendant likewise had a record of prior arrests, as well as convictions.

Before leaving the subject of the Evidence Code, we note the prosecutor has omitted from the record on appeal Hawkins' arrest record or "rap-sheet," to which the prosecutor referred before the Grand Jury in apparent contravention of NRS 48.045(2)—for the explicitly stated purpose of proving to the jurors that Hawkins was "an ordinary crook."[6] However, the prosecutor's vague references in the transcript to Hawkins' prior brushes with the law indicate that six years ago, in 1981—when Hawkins was 20 years old—he was arrested on an unspecified "felony" charge which the Reno police were later constrained to dismiss. Reno police had also arrested Hawkins in 1980, and Sparks police arrested him in 1979, but these unspecified charges likewise were dismissed. The prosecutor also told the Grand Jury that Hawkins had several previous brushes with the law in California, none of which are identified as having resulted in convictions. Now, on appeal, the prosecutor has not contended that the circumstances of any of the arrests bear such similarity to the facts of this case as would justify or compel their admission at trial, to evidence either motive or common plan. *See, e.g.,* Hill v. State, 95 Nev. 327, 594 P.2d 699 (1979), and cases cited therein. Thus, tested by the foregoing principles articulated in the Evidence Code, the prosecutor's references to Hawkins' arrests can hardly be deemed such evidence as would establish that the district court erred by applying *Oliver* and *Moreland.* In any event, the prosecutor has not tendered any principled distinction in this regard.

Finally, placing aside considerations based on the Evidence Code, we think it would be highly questionable policy to single out for prosecution young people who, like Hawkins, succumb to extraordinary temptation—solely because they previously have been arrested. As Justice Felix Frankfurter once noted:

> Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition. . . . A contrary view runs afoul of fundamental principles of equality under law, and would espouse the notion that when

---

[6]*Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."* Id.; emphasis added.

dealing with the criminal classes anything goes. The possibility that no matter what his past crimes and general disposition the defendant might not have committed the particular crime unless confronted with inordinate inducements, must not be ignored. Past crimes do not forever outlaw the criminal and open him to police practices, aimed at securing his repeated conviction, from which the ordinary citizen is protected. The whole ameliorative hopes of modern penology and prison administration strongly counsel against such a view.

Sherman v. United States, 356 U.S. 369, 383 (1958) (Frankfurter, J., concurring in result). Of course, if Justice Frankfurter was correct as to persons who previously have been convicted of crime, we think that, *a fortiori,* he was correct as to persons who merely have previously been arrested.

Thus, so far as we can perceive, the prosecutor in this case has tendered no basis for a principled distinction between the facts of this case and the facts involved in our previous holdings, *Oliver* and *Moreland.* So far as we can see, there was neither social utility,[7] nor legal legitimacy, in tempting Hawkins into crime, and in returning him to the criminal justice system on the basis of purely creative police activity. Sorrells v. United States, 287 U.S. 435, 451 (1932).

In conclusion, we wish to make it clear that we *do not* deem all decoy operations to be unlawful *per se.* If it is not to be illegitimate, however, we believe that a decoy operation must focus upon some real, substantial, and subsisting problem of antisocial behavior, and that it must be structured so as to identify actual social predators who are engaging in such behavior, rather than merely being structured to ensnare weak and gullible persons in the hope of frightening the predators. If a decoy operation is not so structured, we will not deem it to be justified by a contention that the operation may have successfully lured young potential

---

[7]In regard to the matter of social utility, it perhaps may be well to recall again that, at the time of the arrest in question here, Hawkins was a working, contributing member of society. If the judicial system were to countenance such entrapments, working young people "baited" into crime in the manner of Hawkins could thus be transformed into prison inmates, each costing the State of Nevada many thousands of dollars yearly. Moreover, other incalculable social damage could be done by subjecting underclass young men such as Hawkins—who like Hawkins may be making at least some effort to work and lead productive lives—to unfair temptations, gamesmanship, and arbitrary choices made in decoy operations of the kind concerned in the instant case. *Query:* Can prosecutions initiated in the manner of the instant one really be expected to enhance their victim's respect for the law, and to inculcate better social values? Or is the converse true?

criminals of tomorrow into actual criminal conduct today. Even in dealing with the young, the police must detect crime; they may not manufacture it.

In light of the foregoing, we have determined that the district court correctly concluded that our prior decisions in *Oliver* and *Moreland* were controlling in the circumstances of this case. We therefore affirm the district court.

### Addendum Re Dissent

We certainly agree with our respected brother Steffen's admission that he threads a very fine needle in contrasting his dissent today with his concurring vote in *Oliver* and *Moreland*. We also agree with our brother's candid acknowledgment that it is fair to say the essential differences between *Oliver* and *Moreland* and the instant case relate only to Hawkins' attire and the placement of the currency openly tendered as bait. We further agree that, in a judicial system committed to the principle of stare decisis, "[i]t is admittedly troubling to attempt to distinguish the instant case from the other two on such gossamer grounds."

We disagree, however, with our brother Steffen's newly adopted perception that this Court "should not substitute its wisdom" for the policy choices of a young prosecutor and a few youthful officers, who have tried to formulate and justify an attempt to evade our prior rulings. The policy choice of whether the resources of the Nevada courts and related services should be expended on manufactured crime—to punish vulnerable persons who have been duped, in the hope of frightening others who truly are social predators—does not in our opinion become vested in an attorney simply because he has landed a job as a district attorney's deputy. Nor does it become vested in police officers merely because they have survived the rigors of the local police academy. In our view, as laudable as they may be, such accomplishments do not establish prosecutors and police as the living embodiment of a "separate, coordinate branch of government" which possesses a vested power to define "acceptable methodology for dealing with crime" that is superior to this Court's authority to decide whether the already overtaxed resources of the Nevada court system should be expended to fight manufactured crime. In disputed cases, the executive branch does not define what constitutes real crime; the judiciary performs this function.

We level no personal condemnation at the fine young people who conducted the decoy program now under examination. For healthy, energetic people in the prime of life—during balmy summer months when the sidewalks are warm—perhaps few pastimes could seem more enticing than to go fishing for "suckers," like Hawkins, as decoy officers commonly speak of the

dupes who succumb to their artificial bait. And, we fully under-
stand that few such tyros will pause to weigh the social costs of
entrapping young underclass males into manufactured crime, to-
wit:

>   (1) the loss to the entrapped person's employer of a
>   trained, apparently acceptable employee, as was the case
>   here;
>   (2) the loss to society in general of the entrapped person's
>   productivity;
>   (3) the cost to society for the services of publicly paid
>   prosecution and defense counsel, and support personnel;
>   (4) the expenditure of the court system's time, in the
>   justice's court, the district court, the supreme court, and in
>   several stages of post-conviction proceedings in the state and
>   federal courts;
>   (5) the overhead cost of imprisoning a person who previ-
>   ously was self-supporting, at an annual expenditure in the
>   neighborhood of $14,000 per year;
>   (6) the lost use of a prison cell with a replacement value of
>   perhaps $60,000 (generating what economists call an
>   "opportunity cost" of an additional number of thousands of
>   dollars per year), which might otherwise be used to incar-
>   cerate a real criminal;
>   (7) the cost to any family and dependents of the entrapped
>   person, who lose their breadwinner because of a vagrant
>   fortune that he was abroad on a warm night when young
>   officers were out "fishing" for young blacks and other
>   "criminal types"; and
>   (8) finally, the cost to society of maintaining a larger-than-
>   necessary parole and probation system in order to supervise
>   entrapped persons after their release, even though no super-
>   vision would foreseeably have been necessary if the
>   entrapped persons had been left in peace to begin with.

We venture to say nothing about the prospect that, if such officers
were not out "fishing" for "crime-prone" young blacks and
other underclass males, they could utilize their energies discern-
ing real crime elsewhere—surely with less certitude of success,
but with much greater social utility. Nor will we attempt to
quantify the probable social cost of making criminals and con-
victs out of productive persons, who may upon release never
return to the ranks of the gainfully employed.

In short, then, we do not agree with our respected brother
Steffen that this Court should leave the above-mentioned con-
cerns to be assessed solely by the "executive branch"—as repre-
sented by the youthful prosecutor and officers who shaped the
"decoy" operation with which we are concerned in the instant
case.

At least three more observations concerning other aspects of our brother's dissent should be made, to-wit:

(1) Our brother Steffen suggests that, commonly, entrapment is determined as a matter of law only where there has been an "active" as opposed to "passive" tender of a criminal opportunity. As we see it, the doctrine of decisions in decoy cases from Florida and other jurisdictions, which we adopted in *Oliver* and *Moreland,* are not at odds with this view. Rather, they simply recognize that in situations like the instant one, in which police officers set out to tempt vulnerable people by blandishing valuables in circumstances communicating a message that the property may be taken without risk, there is indeed an active and unacceptable solicitation on the part of the police.

(2) Our brother Steffen also says that he "simply is unwilling to assume, on the basis of the record, that the officers were pursuing Hawkins because of his color." Of course, this majority opinion is not premised upon any finding of racial bias. Still, as we recall, in previous Nevada cases involving similar entrapment through decoys, the ensnared persons were black. Indeed, in the instant case, Hawkins, a black man, was arrested and prosecuted although the police immediately released his white companion— who arguably was equally implicated.

Although our brother indicates he does not subscribe to what he calls "racial overtones" of our mentioning such phenomena, we continue to think that minority members of society may find several aspects of the record before us to be quite disconcerting. For example, minorities may strongly suspect, and quite possibly resent, that this kind of decoy operation proceeds according to a self-fulfilling prophecy that young blacks and other underclass males in the police "profile," such as hispanics, are "criminal types." As one of the police officers told the Grand Jury when explaining why the decoy team exposed the bait to Hawkins, while hiding it from three other persons they feared might take it: "He fits the age, sex and race."[8]

Thus, here, still another serious societal cost could result from sanctioning manufactured criminal prosecutions against blacks and any others whom young police officers viscerally sense to be within the "profile" of "criminal types" that they have targeted to be purged from free society.

---

[8]It explicitly appears in the Grand Jury Transcript that, before exposing the bait to Hawkins, the officers withheld it from the view of at least three persons whom they did not wish to entrap, because they were waiting for someone they felt was a "criminal type." As one officer explicitly told the Grand Jury: "[T]here were probably three people that we didn't want to take the money that didn't look like they were criminal types or the type that would ordinarily get into something like that without some obvious temptation." In other words, with calculation, the police waited and then presented the obvious temptation to Hawkins.

(3) Finally, our brother has attempted to distinguish this Court's decisions in *Oliver* and *Moreland* in ways which, we respectfully believe, cannot legitimately be recognized in a jurisprudential system contemplating only distinctions that are meaningful and comprehensible. In setting precedents to be applied by the trial courts, we believe the law must be kept stable and intelligible. We are unwilling, therefore, to join our brother in propounding a distinction declaring that—while the entrapment defense protected Oliver, a black who took ten dollars from an apparently impoverished black decoy in Las Vegas—the defense is now unavailable to Hawkins, a black who took $126.00 from a well-dressed, apparently affluent white decoy in Reno. Nor can we perceive any possibility of saying (as our brother Steffen also suggests) that the instant case is distinguishable from *Oliver* because the black entrapped in *Oliver* had perhaps rationalized his act by thinking he was protecting the decoy against further harm from liquor. Neither our decision, nor the record in *Oliver,* provides any basis whatever for making such a statement. Finally, we can see no basis for suggesting, as does our brother, that the prosecutor's claims about the supposed fears of Reno citizens, totally *dehors* the record, provide any basis for a meaningful distinction.[9]

Young and Springer, JJ., concur.

Steffen, J., with whom Mowbray, J., agrees, dissenting.

With a degree of reluctance which I shall hereafter explain, I respectfully dissent.

To me, the real issue of this appeal concerns the proper role of the judiciary in dictating to a separate, coordinate branch of government acceptable methodology for dealing with crime. However, I would observe at the outset that my concern here does not implicate such court-generated constraints as Mapp v. Ohio,

---

[9]As one justification for concluding that this Court should permit police officers, if it pleases them, to entrap young citizens in the manner now being considered, our brother has mentioned that "we were informed by the state during oral argument that criminal activity in downtown Reno has reached such a high level that many local citizens avoid the area." The young prosecutor did indeed make such a statement, for which we have discerned no support at all in the record. We can locate no data showing that Reno citizens avoid the vicinity of First and Center Streets because they fear crime of any kind—and certainly no support for any suggestion that citizens fear their pockets will be raided if they lie down in a doorway alcove to sleep off a hang-over. In the past, members of this Court ordinarily have not accepted as evidence assertions made by counsel about matters outside the record, and it seems particularly inappropriate to do so about matters which could only be resolved by survey research that has not been performed, so far as anyone can tell from the record. Generally, it has been the practice, rather, to chastise counsel who seek to bias proceedings before us through justification which the record does not support.

367 U.S. 643 (1961) and Miranda v. Arizona, 384 U.S. 436 (1966), that relate to law enforcement activities that have been held to impinge individual rights under the United States Constitution. No such rights are at stake here. The milieu presented by this case involved a simple larceny from the person and the availability of entrapment as a defense to conviction. The judiciary has accorded to defendants such as Hawkins the opportunity to avoid strict legal accountability, thus nullifying improvident or improper prosecutions directed at persons who, without predisposition, have succumbed to "extraordinary temptations or inducements" employed by the state. Oliver v. State, 101 Nev. 308, 309, 703 P.2d 869, 870 (1985) (citing Froggatt v. State, 86 Nev. 267, 467 P.2d 1011 (1970)).

As a rule, entrapment is an issue to be decided by the trier of fact as part of its function to determine the innocence or guilt of an accused. Sherman v. United States, 356 U.S. 369, 377 (1958). There are, of course, exceptions when the issue may be decided as an issue of law. *Id.* In *Sherman,* the Court determined that entrapment had been shown as a matter of law because of repeated entreaties to entice a formerly active addict back into involvement with drugs. The picture thus presented portrayed a former addict who was trying to overcome the degradations and deprivations of drug use and who, at last, succumbed to the majestic efforts of the government to promote his return to drug involvement. I have little trouble invoking entrapment as a matter of law under those circumstances. However, as Justice Frankfurter noted in his concurrence in *Sherman:*

> "This does not mean that the police may not act so as to detect those engaged in criminal conduct and ready and willing to commit further crimes should the occasion arise. Such indeed is their obligation. It does mean that in holding out inducements they should act in such a manner as is likely to induce to the commission of the crime only these persons and not others who would normally avoid crime and through self-struggle resist ordinary temptations."

356 U.S. at 383-84.

In the decoy case of Reyes v. Municipal Court, 173 Cal.Rptr. 48, 51 (Ct.App. 1981), the court said:

> [R]uses, stings and decoys are permissible stratagems in the enforcement of criminal law, and they become invalid only when badgering or importuning takes place to an extent and degree that is likely to induce an otherwise law-abiding person to commit a crime. . . . Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is

impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.

In the instant case, the decoy operation was entirely passive in nature insofar as unsuspecting participants were concerned.[1] I therefore have great difficulty placing this case in the category of entrapment as a matter of law.

Admittedly, I thread a fine needle in contrasting today's dissent with my approval in *Oliver* and Moreland v. State, 101 Nev. 455, 705 P.2d 160 (1985). In *Oliver,* we were unwilling to permit the state to tempt passersby with an apparently drunken, unconscious derelict who exhibited a ten-dollar bill hanging from his tattered pocket. The enticement thus presented was that of an alcoholic who, upon awakening, would likely stagger to the nearest pur-veyor of liquor to exchange the bill for a liquid pacifier. Even those with borderline commitments to honest behavior could rationalize their act of larceny as one of benefit to the health of the derelict. Moreover, the ten-dollar bill could be viewed as more of a symbol for amelioration of the desperate than entice-ment to the criminal. In any event, the spectacle of the decoy operation in *Oliver* seemed to have the distinct flavor of an affront to human dignity and a rational society, factors that persuaded me to decide the issue as a matter of law. Admittedly, those factors waft more of an odor of arrogated judicial wisdom than that of an appropriate jurisdictional basis for dictating law enforcement policy. I suppose it could be argued that an analogue to *Oliver* would be a decision by the court directing the geographic place-ment of police officers in efforts to prevent and detect crime. This court simply should not substitute its wisdom for that of the governmental agency entrusted with the rights and responsibili-ties of law enforcement. Reverting, nevertheless, to the usual methodology of jurisprudes who frequently distinguish the non-distinguishable, the instant case does present, in contrast to *Oliver,* a well-dressed decoy who was ostensibly unconscious. Those who passed the fallen man could only speculate as to the cause of his plight. The currency observably protruding from an envelope in his rear pocket was not hanging as an invitation to removal by minuscule manipulation. Nor was it an indivisible

---

[1]Although I share the concerns of the majority in the wisdom of the type of unfocused net employed in apprehending Hawkins, I do not subscribe to the racial overtones in the majority opinion. If, in fact, race was a motivator in the prosecution of Hawkins, the effort is deserving of condemnation; I am simply unwilling to assume, on the basis of this record, that the officers were pursuing Hawkins because of skin color.

source of relief to the desperate. It was, however, a passively tempting morsel to a thief.

The *Moreland* case fell prey to *Oliver* and was essentially of the same character. The decoy masqueraded as a derelict who was intoxicated or asleep. Protruding from his pocket were three one-dollar bills and a simulated $100 dollar bill. What I have said about *Oliver* may generally be said about *Moreland* with the exception of the large simulated bill and, depending upon the quality of the bill, its potential effect on those attracted to the bait. Still, the spectacle was that of a drunken vagrant whose use of the carelessly exposed currency was predictable.

It could be fairly stated that the essential differences between *Oliver* and *Moreland* and the instant case relate only to the attire and the denominations and placement of the currency. It is admittedly troubling to attempt to distinguish the instant case from the other two on such gossamer grounds. And perhaps what I am honestly doing is re-thinking the course we have taken through *Oliver* and *Moreland*.[2] However, from the prospect of a

---

[2]It is difficult to place our *Oliver* and *Moreland* decisions in either of the two recognized species of judicial responses to crime generated in part by law enforcement officers. The majority of courts have adopted the so-called "subjective" theory of entrapment that focuses on the issue of a defendant's predisposition to commit the crime. Although *Oliver* and *Moreland* have muddied Nevada's law on the subject, clearly prior to those decisions, Nevada stood among the majority of jurisdictions in its approach to entrapment. Thus, in Hill v. State, 95 Nev. 327, 330, 594 P.2d 699, 701 (1979), we said: "Since the defense of entrapment focuses on an appellant's predisposition to commit the crime as charged, evidence that he previously supplied marijuana was relevant in establishing his state of mind while supplying marijuana to the undercover agents." Moreover, we inferentially rejected the minority or so-called "objective" theory of entrapment by referencing a California case that had embraced that theory. *Id.* at 330 n. 8, 594 P.2d at 701 n. 8 (citing People v. Barraza, 591 P.2d 947 (Cal. 1979)). The objective theory looks only to the conduct of the police and therefore views the predisposition of an accused as irrelevant. But even under the objective theory of entrapment *Oliver* and *Moreland* find no harbor, as can be seen from the court's holding in *Barraza:*

> [W]e hold that the proper test of entrapment in California is the following: was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense? For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.

591 P.2d at 955 (footnote omitted). The decoy operations in *Oliver* and *Moreland* would not rise to the level of entrapment under the objective test because there was no badgering, cajoling, importuning or other acts that

judge living in a society with limited assets and a healthy regard for individual freedom, the *Oliver* scenario seemed inherently offensive to both. For the price of a ten-dollar bill displayed as an apple on an isolated tree, a man then rightfully free lost his freedom. And the honest taxpayers of Nevada were forced to divert scarce assets to the cost of incarcerating Oliver for at least part of a ten-year sentence. Equally troubling is the tragic realization that our society has produced a large number of "basically" honest people who rationalize their entitlement to whatever they can take with impunity. Employers consistently sustain substantial losses from employee pilferage "justified" by the conclusion that the employee is underpaid and exploited. The underprivileged in many walks of life conclude that the affluent enjoy life at their expense, and therefore are willing to view life in part as the law of the jungle and the survival of the fittest. While I do not condone theft or dishonesty even on the level of *Oliver,* I do not see societal benefit stemming from efforts to entice and incarcerate persons who succumb to the temptation of a ten-dollar bill dangled before them in trappings that virtually assure an undetected opportunity for some rationalized enrichment at perhaps not great personal expense to the victim. Even if the state elects not to prosecute after arrest, the trauma of the arrest and the stigma of the record cause one to reflect on the value of such an operation. Moreover, if the arrest reveals a fish that has frequented the criminal justice waters on previous occasions, can we truly claim triumph in having developed an artifice that has successfully strengthened the recidivism rate?

On the other hand, we were informed by the state during oral argument that criminal activity in downtown Reno has reached such a high level that many local citizens avoid the area. The challenges facing law enforcement agencies in preventing crime and apprehending criminals are enormous. Because, as judicial officers, we do not shoulder the burden of our law enforcement agencies, I am most reluctant to limit the options available to them in protecting society. It seems to me that the measured response of the criminal justice system to the unacceptable manufacturing of crime by police is the defense of entrapment. Rarely, I suggest, should the issue of entrapment be decided as a matter of law. The *Olivers* and *Morelands* should be the exception rather than the rule. Moreover, I am reluctant to decide, as a matter of law, that the police decoy operating here was either unwarranted or inordinately enticing. As previously stated, the decoy was well

could reasonably be viewed as overbearing. It therefore appears that our *Oliver* and *Moreland* precedents represent some form of hybrid approach that tends to invalidate police efforts based upon a judicially perceived lack of prudence or practical worth. As previously noted, I seriously question whether our hybrid is worthy of an extended life.

dressed and the bait less readily available than in *Oliver* and *Moreland.* The stage thus presented was not that of a drunken derelict who would likely awaken and perhaps do no more than wonder where or how he lost the money to buy another bottle. Additionally, as in *Oliver* and *Moreland,* there was no importuning, cajoling, badgering or affirmative measures taken to induce Hawkins to commit the crime. In short, however tenuous the differences between the instant case and *Oliver* and *Moreland,* I cannot conclude as a matter of law that the decoy operation utilized here constituted entrapment.

Although I am becoming progressively persuaded that we should not presume to dictate how, when and where police officials should exercise their rightful prerogatives in protecting society, I do not wish to be understood as favoring indiscriminate decoys that do not focus on existing criminal activity. As noted previously, even if a passive decoy operation snares an individual who has demonstrated past criminal propensities, but is otherwise apparently functioning within the law—or at least is not wanted by law enforcement authorities—I have some difficulty viewing the creation of a recidivist as a sensible triumph of law enforcement. I am nevertheless willing to assume that our law enforcement officials, who must answer to the public concerning the use of their limited resources, will utilize those resources reasonably. If they do not do so in the area of decoy operations, the law of entrapment should protect an accused from an improper conviction.

I must also disagree with the majority's view of the evidence code in an attempt by the State to prove predisposition. In *Busby,* a recent case on the subject, the court held:

> In determining whether a criminal defendant is predisposed to commit a particular crime we examine: *"the character or reputation of the defendant, including any prior criminal record;* whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government."

United States v. Busby, 780 F.2d 804, 807 (9th Cir. 1986) (emphasis added) (quoting United States v. Reynoso-Ulloa, 548 F.2d 1329, 1336 (9th Cir. 1977), *cert. denied,* 436 U.S. 926, (1978)). Obviously, an appellate court could not review the character, reputation, and prior criminal record of a defendant if they were inadmissible at trial. In my view, they clearly are admissible to show predisposition under the intent exception

specified in NRS 48.045(2). Moreover, we have already held in Nevada that evidence of prior offenses is admissible on the issue of predisposition unless its probative value is outweighed by its prejudicial impact, a determination left to the sound discretion of the trial judge. Hill v. State, 95 Nev. 327, 329-30, 594 P.2d 699, 700-01 (1979). The rule admitting such evidence to show predisposition is so well established throughout the country that further citation is unnecessary.

Because I cannot conclude as a matter of law that Hawkins was entrapped, I would reverse and remand for trial.