*883 OPINION
By the Court, Shearing, C. J.:
Appellant John Butler was convicted by a jury of two counts of first-degree murder with the use of a deadly weapon and was thereafter sentenced by the jury to death. On appeal, we affirm Butler’s convictions, but we vacate his death sentences and remand for a new penalty hearing.

FACTS

I. Guilt phase

John Butler was an influential member of a white supremacist gang known as the Independent Nazi Skinheads (INS). The victims Linn Newborn, an African-American male, and Daniel Shersty, a Caucasian male, were members of a rival nonracist gang known as Skinheads Against Racial Prejudice (SHARP). Newborn was a leader of SHARP.
INS was distinguishable from SHARP by its manner of dress and beliefs. The members of these two gangs clashed because of opposing views on racism. INS members want to preserve the white race without pollution from other races; SHARP members want to promote racial unity. According to Las Vegas Metropolitan Police Department (LVMPD) Officer Greg Damarin, a former gang unit detective, both INS and SHARP are violent skinhead gangs.
On the evening of July 3, 1998, Newborn was at his place of work, Tribal Body Piercing. The Stakeout Bar and Grill was located in the same shopping center as Tribal Body Piercing, and Carolyn Trotti was also at work that night tending the bar. Trotti identified Melissa Hack, an INS member and Butler’s girlfriend, as one of two girls that had been in and out of the bar four or five times that night. Newborn and Shersty later told friends that they were going to party that night with a couple of girls they had met at Newborn’s work when Newborn had pierced one of them. Newborn and Shersty were never heard from again.
On the morning of July 4, 1998, Butler called Joey Justin and said that he needed help doing something but did not want to talk about it over the phone. Butler and Melissa later picked up Justin and drove to a dirt road in the desert. On the way there, Butler said that “he needed help picking up some mistakes they left out there from the night before,” including a beer bottle with Melissa’s fingerprints on it and shotgun shells. Butler warned Justin that he would possibly see one or two bodies. After arriving, Justin saw a blood-covered body on the ground. He and Melissa began picking *884 up the pieces of a broken bottle in the dirt when they noticed someone was approaching. Justin yelled for Butler.
Anthony Harris, his father James, and a family friend were riding recreational all terrain vehicles (ATVs) in the desert when they came upon a body, later identified as Shersty’s, which was covered with blood and lying on the ground. The ATV riders next saw two males, one of whom Anthony Harris identified as Butler, and a female approaching from the desert. The approaching group waved their hands. Butler yelled to ask whether the ATV riders had a cellular phone to call the police.
Butler and his companions got inside their car. The female covered her face and ducked down. James Harris used his cellular phone to call the police. Butler drove toward the ATV riders. As the car passed, Butler stopped to say that his girlfriend was sick and that he could not stay. Anthony Harris wrote the vehicle’s license plate number in the dirt. Butler noticed this and told Anthony that it was unnecessary — Butler would give him a pager number.[2] Butler soon drove away.
While Butler drove Justin home, Butler told him that if the police asked, he should say that they were out looking for a place to ignite fireworks. Butler explained that he and Melissa’s brother, Ross Hack, who was also an INS member, ambushed the two victims in the desert the previous night, after Melissa and one of her friends went to Tribal Body Piercing to set up a date with them. One of the girls got pierced. Then the girls drove out to the desert with the victims, who were planning to drink and party. Butler said that he ran up with a shotgun and killed one victim right away. Ross Hack then used a .32 caliber gun and shot at the other victim but ran out of bullets. Butler chased this victim into the desert and killed him with a shotgun. Butler told Justin that he would be placed in Butler’s INS crew if he proved he could be trusted.
LVMPD officers responded to a call that morning and found Shersty’s body partially under his vehicle. Officers recovered one 12-gauge shotgun shell. Medical Examiner Giles Green autopsied Shersty’s body. The head bore bruises and abrasions. The body had a shotgun wound to the side of the chest and two .32 caliber bullet wounds to the face and neck areas. The wounds indicated that Shersty was shot at a fairly close range. Examiner Green believed that the cause of Shersty’s death was homicide. He opined that it would have taken some time for Shersty to die from hemorrhaging and disruption of breathing.
Newborn’s friends had reported him missing. Two days later, LVMPD officers returned to the desert and found his body as well *885 as shotgun shells in the area. An open knife was lying at the foot of the body. Examiner Green also autopsied Newborn’s body. It had maggots and was partly decomposed. The right side of his body and abdomen bore shotgun wounds as did the left side of his back, shoulder, and arm, indicating that he was shot at least twice with a shotgun. A small caliber gunshot wound was also found behind his ear. A bullet recovered from the head wound was later identified by a firearms expert as being a .38 caliber. Examiner Green believed that the cause of Newborn’s death was homicide. Among other things, a partially obliterated store receipt for beer purchased at 12:34 a.m. on July 4, 1998, was also recovered.
Ten days later, LVMPD gang unit detectives found Butler standing by a vehicle next to Justin. Butler made eye contact with the detectives and ran as they approached. One officer gave chase and recovered a .32 caliber handgun in Butler’s trail. A K-9 officer and his dog later found Butler hiding in the brush where he was arrested.[3] Butler stipulated that he was in possession of the handgun found on the day of his arrest. A firearms expert determined that the handgun fired the two bullets recovered from Shersty’s body, but could not tie the .38 caliber bullet recovered from Newborn’s body to a particular weapon.
After his arrest, Butler agreed to give a statement to LVMPD Homicide Sergeant Ken Hefner. Butler claimed that he, Melissa, and Justin went to the desert on the morning of July 4 to scout for a location to ignite fireworks. He was driving down a dirt road when they discovered a body lying next to a car. Butler claimed that they decided to contact the police by hiking into the desert to some houses but hailed some ATV riders instead when he learned that they had a cellular phone. Butler admitted that he told the ATV riders that it was not necessary to write down the license plate number of the car he was driving and that he left without leaving the pager number he promised. Butler also admitted that he was involved with a racist skinhead gang, he knew the victims were members of an antiracist skinhead gang, and there had been conflicts between the two gangs. Butler blamed coincidence for why he happened to be in the area where the two victims were found.
Butler was later housed at a detention center in the same cell as inmate Richard Fishburn and shared a module with inmates Don Savage and Brian Jones. According to these three inmates, Butler made several inculpatory statements to them about the murders. The State produced other witnesses and evidence to prove Butler’s guilt.
*886 To rebut the State’s case against him, Butler presented several witnesses to testify regarding his whereabouts on the night of the murders. Many witnesses placed Butler at the home of his mother, Cynthia Glosson. Other witnesses placed Butler at the home of his brother, Lonnie Butler. Some witnesses also placed Butler at a Stratosphere Hotel and Casino fireworks event that allegedly occurred that night. Melissa’s father, Jacob Hack, believed that Butler stayed the night at his house. Butler attempted to show that alleged skinhead Daniel Hartung was responsible for the killings. He also tried to discredit the identification of Melissa by the Stakeout’s bartender, Carolyn Trotti. The State presented witnesses in rebuttal.
The jury found Butler guilty of two counts of first-degree murder with use of a deadly weapon.

II. Penally phase

The State presented victim impact witnesses during the penalty hearing. Dorothy Pinella, Shersty’s aunt, testified about the impact of his death on his family. Shersty was a former member of the United States Air Force. She expressed sorrow for Butler and forgiveness of him. Lionel Newborn, Newborn’s father, testified regarding his close relationship with his son and the impact of his death on his family. Newborn was also the father of a young son.
Officer Damarin testified that Butler had worked as a police informant in various cases and for his efforts had received various benefits in prosecutions against him. He also testified that when Butler was arrested in this case, he possessed a stolen jeep, had two outstanding warrants for felony possession of a stolen vehicle, and had the key to the jeep and a small bag of methamphetamine. Inside the jeep, officers found a letter that had been sent from inside of a prison or jail and addressed to Polar Bear (Butler’s moniker). It stated, in part, “ ‘Do you know this punir ass SHARP named Spit [Newborn’s moniker]? You pulled a gun on his bitch.’ ” The letter writer also wanted “this punk Spit to know that he can be reached out and touched.”
Other witnesses testified for the State regarding Butler’s lengthy criminal history and prison record and specifically noted several separate instances of prisoner misconduct by Butler that resulted in disciplinary segregation. It was also shown that Butler had been arrested or cited 32 times for various misdemeanor and felony offenses.
The defense presented several witnesses to provide testimony about Butler’s chaotic childhood. Butler’s mother, Cynthia Glosson, testified that she left Butler’s father before his birth and that Butler grew up as a child without his father’s involvement— Butler had never seen his biological father. Glosson repeatedly moved between various states. Sometimes she and her children *887 lived with her parents, who were alcoholics and abusive. She remarried twice and eventually moved her three sons, including Butler, to Las Vegas. Once in Las Vegas, Glosson lived with her children in a nightly-basis motel where she cleaned rooms, getting paid $2 per room. She became a manager at this hotel, but later lost her job. Butler did not adjust to his new high school; he often ditched school and was brought home for curfew violations. Around this time, an electrician and convicted pedophile named Richard Bridges offered to train Butler as an apprentice. Before meeting Bridges, Butler was “a normal, loving, good kid.” After spending time with Bridges, Butler’s personality changed. He became evasive and addicted to crack cocaine, which was given to him by Bridges. Butler ended up in a juvenile detention facility for violating juvenile probation. He eventually earned his GED and later fathered a son whom he loved. Glosson expressed her love for Butler, saying that he was one-third of her heart.
Kim Kaigler, a friend of Bridges, testified that Bridges had multiple prior convictions for sex crimes involving young boys in California. Kaigler first met Butler when he was about 14 years old. He was thin and dirty. Bridges bought Butler nice things and later made sexual advances on him. In response, Butler became scared and asked Bridges to stop, getting tears in his eyes.
Butler’s uncle John Fahreny also testified. Fahreny reiterated Glosson’s description of Butler’s grandmother as a violent alcoholic and described how Butler witnessed many instances of abuse by her. Fahreny introduced Butler to marijuana when he was about 12 or 13 years old. Fahreny saw Butler in Las Vegas a few years later, and Butler introduced Fahreny to prostitutes and crack cocaine. Fahreny said he would attempt to maintain a close relationship with Butler even while Butler was in prison.
Clinical and forensic psychologist Mark Cunningham testified as an expert witness regarding United States Justice Department statistics and concluded that Butler’s childhood placed him in a high-risk category for violent criminal behavior. Dr. Cunningham noted, among other things, the absence in Butler’s childhood of a positive male role model, his mother’s alcohol and illegal drug abuse, and his chaotic and unstable home life. These factors were compounded by the traumatic sexual abuse Butler suffered as a teenager. Butler became affiliated with the skinhead gangs while he was in prison.
LVMPD Gang Unit Intelligence Officer Dante Tromba testified that he had known Butler since 1998 and that other prison inmates felt that Butler was “a stand up kind of guy.” According to Officer Tromba, while Butler was incarcerated in the Clark County Detention Center (CCDC), he risked his own safety by assisting with finding weapons and drugs and alerting officers to racial and *888 gang problems both inside the facility and in the community. Butler had also volunteered to participate in the youth diversion program. Butler’s only problems while incarcerated at CCDC concerned a shank and a disrespectful comment. Two prison inmates also testified favorably on Butler’s behalf.
Butler made a statement in allocution, expressing sorrow for the families of Shersty and Newborn as well as his own family. He stated that he had turned his life around since being incarcerated.
The sole aggravator found for each murder was that each was committed by a person who had, in the immediate proceeding, been convicted of more than one offense of murder. And as to mitigating circumstances, the jury found that Butler had a lifelong dysfunctional family, had lifelong habitual drug abuse, suffered sexual abuse and poverty, and lacked a father figure and positive male role model. As to each murder count, the jury found that the aggravating circumstance outweighed the mitigating circumstances and imposed a sentence of death.

III. Motion for a new trial

Butler moved for a new trial based on the State’s failure to disclose evidence that Carolyn Trotti, the bartender for the Stakeout Bar, identified a defense alibi witness, Katie Wilson, as the second woman she saw with Melissa on the night of the murders. Butler argued that this new information brought into question Trotti’s identification of Melissa. The trial court ordered a new penalty hearing. The parties cross-appealed. This court affirmed the denial of the new trial motion with respect to the guilt phase, but reversed the order with respect to the penalty phase, concluding that the evidence was not material and did not “make a different result reasonably probable in the penalty phase.” However, this court shared the trial court’s concern about the State’s failure to promptly notify the defense of this evidence.[4]
On March 17, 2003, the district court entered its judgment of conviction and sentenced Butler to death. This appeal followed, raising several issues concerning the guilt and penalty phases of Butler’s trial.

DISCUSSION

Admissibility of gang-affiliation evidence

Butler contends that the trial court erred in allowing the State to introduce evidence about his INS gang affiliation. We disagree.
*889 The decision to admit gang-affiliation evidence rests within the discretion of the trial court.[5] Prior to its admission, however, the trial court must determine whether (1) the evidence is relevant, (2) it is proven by clear and convincing evidence, and (3) its probative value is not substantially outweighed by the danger of unfair prejudice.[6] This court has repeatedly held that gang-affiliation evidence may be relevant and probative when it is admitted to prove motive.[7]
NRS 48.045(2) provides:
Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Additionally, NRS 48.035(3) provides in part that evidence of another act may be admissible if the act “is so closely related to an act in controversy or a crime charged that an ordinary witness cannot describe the act in controversy or the crime charged without referring to the other act or crime.” When admitting evidence under NRS 48.035(3), upon request, the trial court must give a cautionary instruction to the jury.[8]
Here, evidence of Butler’s INS gang affiliation was essential to show his motive for murdering Newborn and Shersty. The evidence provided the common thread that connected the story of events. Moreover, the trial court properly held a pretrial Petrocelli hearing and determined that the evidence was relevant, was proven by clear and convincing evidence, and was more probative of motive than it was prejudicial. And the trial court gave an appropriate cautionary instruction to the jury on the use of the evidence before deliberations. We conclude that the trial court did not abuse its discretion in admitting evidence of Butler’s INS gang affiliation.[9]

*890
Impeaching a witness with a prior gross misdemeanor conviction

Butler contends that the State engaged in deliberate misconduct by impeaching defense witness Katie Wilson on cross-examination with questions relating to her prior conviction for attempted forgery — a gross misdemeanor. We disagree.
The State acknowledges that NRS 50.095 did not authorize cross-examining Wilson on her prior gross misdemeanor conviction.[10] However, because the crime of forgery involves dishonesty, the State maintains that the questioning went to Wilson’s veracity and that pursuant to NRS 50.085 the trial court properly overruled Butler’s objection.
NRS 50.085(3) provides:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into on cross-examination of the witness himself or on cross-examination of a witness who testifies to an opinion of his character for truthfulness or untruthfulness ....
This court has held that “NRS 50.085(3) permits impeaching a witness on cross-examination with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness.”[11] Yet this court has cautioned that in so doing the State may generally not impeach a witness under NRS 50.085(3) on a collateral matter or by introducing extrinsic evidence.[12] If the witness de *891 nies a specific act on cross-examination, the State may not introduce extrinsic evidence to the contrary.[13]
Attempted forgery is a crime involving dishonesty and conduct that goes to Wilson’s truthfulness as a witness. There is also no indication that the State attempted to impeach Wilson by introducing extrinsic evidence. Rather, the State merely asked her questions about the prior conviction on cross-examination, which she answered. We conclude that under these particular facts, the State’s cross-examination of Wilson was proper pursuant to NRS 50.085(3).

Notice requirements of NRS 174.233 regarding rebuttal alibi witnesses

Butler contends that the State failed to comply with the notice requirements of NRS 174.233 and the trial court abused its discretion by finding good cause for waiving the statute’s requirements. We disagree.
Butler presented numerous alibi witnesses, some of whom testified that Butler was with them on the night of July 3, 1998, during a music and fireworks event at the Stratosphere Hotel and Casino. Later, the State sought to call Gerald Scott, the Stratosphere’s Hotel Fire Safety Manager, as a rebuttal alibi witness to testify that there were no fireworks events held by the hotel on July 3, 1998. Butler objected, contending that the State failed to satisfy NRS 174.233.
NRS 174.233(2) requires the State to give the defense notice of any known rebuttal alibi witnesses “[n]ot less than 10 days after receipt of the defendant’s list of witnesses.” NRS 174.233(5) provides:
If the prosecuting attorney fails to file and serve a copy on the defendant of a list of witnesses as required by this section, the court may exclude evidence offered by the State in rebuttal to the defendant’s evidence of alibi. . . . For good cause shown the court may waive the requirements of this section.
In Evans v. State,[14] this court reviewed the notice requirements in an earlier version of this statute containing nearly identical language. This court reasoned that the primary purpose of the statute is to counter the ease with which an alibi can be fabricated and de *892 fend the State’s interest in protecting against a belated alibi defense, adding that “the exclusion provisions [of the statute] should not be blindly employed to make the criminal prosecution a game.”[15] A trial court’s discretion under this notice statute should be exercised whenever good cause appears, and a good cause finding will be upheld on appeal absent a manifest abuse of that discretion.[16]
Here, although the trial court acknowledged that the State failed to comply with the notice requirements of NRS' 174.233, the trial court found that the State had previously given Butler at least some verbal notice of its intent to call Scott as a rebuttal alibi witness. It also found that Scott’s testimony went to a fact that was important for the jury to consider in the interest of truth. We note that Butler has failed to specify how he could have impeached Scott’s testimony even if given timely notice under NRS 174.233 and has therefore shown no prejudice. We conclude that the trial court’s good cause finding was reasoned and well within its discretion as contemplated by the statute.[17]

Interpretation of NRS 175.151

Butler contends that the trial court erred in refusing to allow both of his counsel to individually address the jury during the penalty hearing. Butler contends NRS 175.151 gives him that right. We agree.
The interpretation of a statute is a question of law subject to de novo review by this court.[18] Statutes should be given their plain meaning and “must be construed as a whole and not be read in a way that would render words or phrases superfluous or make a *893 provision nugatory.”[19] Further, every word, phrase, and provision of a statute is presumed to have meaning.[20] Only when the plain meaning of a statute is ambiguous will this court look beyond the language to consider its meaning in light of its spirit, subject matter, and public policy.[21]
Although this court has recognized that NRS 175.151 “speaks to the number of counsel authorized to argue a case,”[22] this issue is one of first impression. NRS 175.151 provides:
If the indictment or information be for an offense punishable with death, two counsel on each side may argue the case to the jury, but in such case, as well as in all others, the counsel for the State must open and conclude the argument. If it be for any other offense, the court may, in its discretion, restrict the argument to one counsel on each side.
NRS 175.151 contains two sentences, each addressing separate and distinct grants of authority — one applying to capital defendants, the other applying to noncapital defendants. In order to discern a reasonably plain meaning from this statute, both sentences must be read in conjunction with each other. Our attention is specifically drawn to the word “may” as it appears twice in NRS 175.151, once in each of the statute’s two sentences. “May,” as it is used in legislative enactments, is often construed as a permissive grant of authority,[23] and it is used permissively in this statute as well. However, the word ‘ ‘may’ ’ as it is used in the first sentence of the statute gives the discretion in capital cases to the counsel for each party, not the trial court; whereas in the second sentence, the word “may” gives the discretion in noncapital cases to the trial court.
We reach this conclusion because the second sentence of the statute expressly states that for any noncapital offense, ‘ ‘the court may, in its discretion, restrict the argument to one counsel on each side.’ ’ The statute contains no express grant of discretionary authority to the trial court to deny such a request in the first sentence when referring to capital defendants. On the contrary, the *894 first sentence provides that “counsel . . . may” argue to the jury. Moreover, reading the statute to give discretion to the trial court in both capital and noncapital cases would render the entire first sentence and its distinct wording superfluous.
By construing the textual provisions of NRS 175.151 as a whole, the statute’s plain language reasonably extends to capital defendants the option of having both of their counsel address the jury and allows that option as to all other criminal defendants only at the discretion of the trial court. A capital defendant’s request to have both of his counsel argue should be honored pursuant to NRS 175.151. We conclude that the trial court erred in denying Butler’s request.[24]

“Other matter” evidence jury instruction

Butler contends that the trial court erroneously instructed the jury regarding the limited use of “other matter” evidence admitted against him during the penalty hearing. He contends that the instruction was confusing and inadequate. We agree.
Instruction No. 6, ostensibly based on Holloway v. State,[25] provided:
As to evidence concerning any other matter which the court deems relevant to sentence. It must be relevant, to be relevant, like mitigating evidence, it must relate to the offense, defendant or victim. Furthermore, under Nevada Statutory sentencing scheme, the State can offer this evidence for only one purpose: for jurors to consider in deciding on an appropriate sentence after they have determined whether the defendant is or is not eligible for death.
“Other matter” evidence is not admissible for use by the jury in determining the existence of aggravating circumstances or in weighing them against mitigating circumstances.
Three purposes are proper: to prove an enumerated aggra-vator, to rebut specific mitigating evidence, or to aid the jury in determining the appropriate sentence after any enumerated aggravating circumstances have been weighed against any mitigating circumstances. Once the jurors determine whether or not the defendant is death-eligible, then they must consider all the relevant evidence to determine the appropriate sentence for the defendant.
Butler did not object to Instruction No. 6, but unsuccessfully requested further instruction pursuant to Holloway. Butler argued *895 that “only evidence that’s been previously designated as proper rebuttal evidence can be argued by the State as evidence that would be considered in the weighing process of aggravation versus mitigation.” Concerned about invading the jury’s province, the trial court refused the request.
NRS 175.552(3) provides in relevant part that during a penalty phase “evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence.” This court interpreted this statute in Hollaway, stating: “ ‘Other matter’ evidence is not admissible for use by the jury in determining the existence of aggravating circumstances or in weighing them against mitigating circumstances. Such use of this evidence would undermine the constitutional narrowing process which the enumeration and weighing of specific aggravators is designed to implement.”[26] Rather, this court held that the State may introduce “other matter” evidence for only one purpose: “for jurors to consider in deciding on an appropriate sentence after they have determined whether the defendant is or is not eligible for death.”[27]
This court therefore directed “the district courts at capital penalty hearings to ascertain the purpose for which the State offers any evidence and to inform the jury of the evidence’s proper use.”[28] In regard to “other matter” evidence, “the court must admonish the jury that the evidence is not to be used in determining the existence or the weight of aggravating circumstances.’ ’[29]
Instruction No. 6 is problematic because it first gave this admonition and then contradicted it. After explaining the proper use of “other matter” evidence, the instruction stated: “Three purposes are proper: to prove an enumerated aggravator, to rebut specific mitigating evidence, or to aid the jury in determining the appropriate sentence after any enumerated aggravating circumstances have been weighed against any mitigating circumstances.” This statement was used completely out of context and implied that the three purposes were all proper for “other matter” evidence. Neither this instruction nor the jury instructions as a whole explained that these three purposes serve to distinguish three categories of State’s evidence and that only the last purpose applies to “other matter” evidence. The instruction failed to describe the three categories of evidence and to explain that they are distinguished because only certain evidence should be considered in de *896 termining death eligibility, i.e., in finding aggravating circumstances and in weighing them against mitigating circumstances. The instruction was self-contradictory, and a reasonable juror could have been misled to consider “other matter” evidence in determining that Butler was death eligible.
The State argues that even if this is true, the error was harmless because the evidence for the one aggravator found by the jury — that Butler committed multiple murders — was conclusive. This argument is persuasive in regard to the jury’s finding of the aggravating circumstance, but it fails to address the jury’s weighing of that aggravating circumstance against the mitigating circumstances.
Because of the erroneous instruction, it is likely that jurors considered all the evidence presented against Butler in deciding whether the mitigating circumstances outweighed the aggravating circumstance instead of discriminating between evidence relevant to rebut Butler’s alleged mitigators and other evidence not relevant to that issue. For example, because Butler did not argue lack of a prior criminal history as a mitigating circumstance, the jurors should not have considered the State’s extensive evidence of his criminal history in determining whether Butler was death eligible. But the instruction failed to clearly instruct them not to do so.
We conclude that there was a strong likelihood that Butler was prejudiced by this instruction. In reaching this conclusion, we stress that Butler presented compelling evidence of extreme neglect and abuse in his childhood, which the jurors obviously recognized in finding several mitigating circumstances, while the State alleged and the jury found only one aggravating circumstance.

Allegations of prosecutorial misconduct

Butler contends that the State committed several instances of prosecutorial misconduct during the penalty hearing.
“To determine if prejudicial prosecutorial misconduct occurred, the relevant inquiry is whether a prosecutor’s statements so infected the proceedings with unfairness as to make the results a denial of due process.”[30] However, “‘a criminal conviction is not to be lightly overturned on the basis of a prosecutor’s comments standing alone,’ ” and the alleged improper remarks must be read in context.[31]
Butler first contends that the State improperly alluded to evidence not in the record in an attempt to mislead the jury with the following remarks:
*897 In all reality, what happened here, ladies and gentlemen, when you sat back and saw what came from the witness stand, is basically a sanitized process where: You didn’t get to see exactly what happened; you weren’t out there; you didn’t get to hear the screams; you didn’t get to see Spit running through the desert, running from somebody shooting him with a shotgun; you didn’t get to hear, as Dan Savage [sic] testified, and I—
[Defense Counsel]: Your Honor, I’m going to object.
I don’t think it’s proper to refer to the victims without any evidence as to what went on out there.
THE COURT: I’ll allow the argument.
[Prosecutor]: If you’ll recall, in my closing argument in our guilt phase, I asked you to remember what you saw in the notes.
I had an opportunity to look it up in the transcript and Don Savage testified the victim on the bumper was looking up, begging; said Spit was running from his attacker.
Basically, we know Spit, Lin, was being tracked down and shot, shot multiple times; and we know he was shot in the desert.
We know that Dan was shot right in the mouth.
It is improper to “ ‘argue facts or inferences not supported by the evidence.’ ”[32] Here, Butler’s objection focuses on the State alluding to Newborn’s and Shersty’s alleged screams and Shersty’s alleged begging before being shot. The State is correct that there was evidence that Shersty was looking upward and begging before being shot and that Newborn was shot in the back while fleeing. Butler is correct that there was no evidence about the sounds Newborn and Shersty may have made before being killed. It was improper for the State to frame the reference to “the screams” as fact, which it appears to have done. Yet we conclude that the inferences the State asked the jurors to draw were reasonable under the facts of this case and any error in the remarks was harmless at most.
Next, Butler contends that the State improperly implied that defense counsel were deceptive and disparaged them with the following remarks:
Keep your eye on the ball. The defense is holding the ball in the dirt. They want you to be distracted from what the issue *898 is, look away from the crime that was committed. They want you to look back 20 years, as if somehow that mitigates what happened two years ago on the 4th of July.
James Therber said: You can fool most of the people all the time.
Do not be fooled. What we have had here is a very creative argument. What we’ve had here this last week has been an infomercial: Buy this product.
Let’s look at this product — and the defense has been marketing this product. This product is the defendant doesn’t merit death for his actions. And they have used some techniques to market this product.
First of all, they want you to somehow believe that his childhood, his experiences, and because of that circumstance in which he was in, which probably many, many, many thousands, millions, are in, is somehow a mitigator, somehow mitigates against that brutal murder that occurred in the desert.
He wants special consideration. Many of you probably know people who had similar upbringings, come from families where the parents were alcoholics, where you have friends who abused drugs, friends who have been sexually abused, and yet, somehow, that’s an excuse for his action.
It should be insulting.
[DEFENSE COUNSEL]: Your Honor, object.
May we approach for a moment on this?
THE COURT: Yes.
Disparaging remarks directed toward defense counsel “have absolutely no place in a courtroom, and clearly constitute misconduct.’ ’[33] And it is not only improper to disparage defense counsel personally, but also to disparage legitimate defense tactics.[34]
Here, the State used many adjectives and analogies in these remarks that portrayed Butler’s presentation of mitigating evidence and defense tactics as a dirty technique in an attempt to fool and distract the jury, implying that Butler’s counsel acted unethically in his defense — this was a form of disparagement of counsel. Butler not only has a legal right, but his counsel have an ethical duty, to present all evidence in mitigation of a death sentence.[35] The presentation of mitigating evidence during the penalty phase is essen *899 tially the heart of a defense. The State is not permitted to disparage Butler’s counsel and defense tactics through the use of cleverly crafted rhetoric. We conclude that the State’s remarks were improper.
Butler finally contends that the State committed misconduct by disparaging his witnesses in two separate instances:
They brought in that high falootin’ expert, getting paid over $200 an hour, and we saw the infomercial complete with testimonials: Just like Ronco; set it and forget it. Put him in life without the possibility; put him there. He’ll be in ad seg forever. You don’t have to worry about it. Set it and forget it.
These pseudo experts, who come in here, as employment. Mr. Esten who came in here to give you testimony about Ely State Prison, and yet he knew nothing about it, nothing about it.
Clark County paid him $125 — or 120 plus dollars an hour to be here, and they could have just brought Mr. McDaniel in, who is the warden there, but he wouldn’t have given that spin, that marketing. He wouldn’t have given what they wanted.
This court held in Sipsas v. State[36] that it was improper for the State to characterize a defendant’s expert medical witness as the following: “The hired gun from Hot Tub Country. Have stethoscope, will travel.” And in McGuire v. State[37] this court held that it was improper for the State to refer “to the fact that the costs of medical witnesses who had testified [for the defendant] at trial had been paid for at county expense by such persons as the jurors themselves.’ ’
Referring to a defense expert witness in the case at hand as “that high falootin’ expert” and his testimony as an “infomercial” was improper, analogous to the abusive remarks condemned in Sipsas. Based on McGuire, it was also improper for the State to twice remark about how much money the defense experts were being paid for their testimony. And the State’s remarks further implied that Butler was wasting taxpayer dollars by calling James Esten as an expert witness. We conclude that these final remarks were again improper.[38]

*900
Cumulative error

“The cumulative effect of errors may violate a defendant’s constitutional right to a fair trial even though errors are harmless individually.”[39] Here, we reject Butler’s assignments of error respecting the guilt phase of his trial. However, the following errors occurred during the penalty phase of his trial: (1) the trial court improperly denied Butler’s request that both of his counsel argue pursuant to NRS 175.151, (2) the trial court gave the jury an erroneous instruction regarding the use of “other matter” evidence, and (3) the State made several inflammatory and disparaging remarks to the jury.
The State notes that Butler did not object to some of its penalty hearing remarks and contends that these remarks were not properly preserved for appellate review. NRS 177.055(2) requires this court to review every death sentence and consider, among other things, whether it “was imposed under the influence of passion, prejudice or any arbitrary factor.” We will therefore consider the effect of these remarks and any other error on the jury’s sentencing decision.[40]
Although overwhelming evidence supports Butler’s two convictions, he was entitled to a hearing that was fair before the jury decided to impose a penalty of death. The strong likelihood that Butler was prejudiced by the erroneous “other matter” evidence instruction may have been sufficiént to constitute reversible error in itself. Viewed with the other penalty hearing errors, we conclude that the cumulative impact of these errors deprived Butler of that fair hearing. We therefore remand his case for a new penalty hearing.

CONCLUSION

We affirm Butler’s two convictions for first-degree murder with the use of a deadly weapon. Due to cumulative error during the penalty hearing, we vacate Butler’s death sentences and remand for a new penalty hearing.
Rose and Becker, JJ., concur.

Anthony was not certain whether Butler actually left a number. According to Justin, Butler gave the ATV riders a number, but he had never seen Butler with a pager.

During the investigation into the killings, officers checked into many other possible suspects, including Ross Hack. It was believed, however, that Ross Hack had fled to the Czech Republic.

State v. Butler, Docket No. 37591 (Order Affirming in Part, Reversing in Part and Remanding, May 14, 2002).

See Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985), modified on other grounds by Sonner v. State, 112 Nev. 1328, 1334, 930 P.2d 707, 711-12 (1996).

See Qualls v. State, 114 Nev. 900, 902, 961 P.2d 765, 766 (1998); Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

See, e.g., Lara v. State, 120 Nev. 177, 180, 87 P.3d 528, 530 (2004); Lay v. State, 110 Nev. 1189, 1195-96, 886 P.2d 448, 452-53 (1994).

See NRS 48.035(3).

Butler also raises several subarguments to this issue. Butler contends that the admission of the gang-affiliation evidence violated his First Amendment *890 rights and cites to Dawson v. Delaware, 503 U.S. 159, 165-67 (1992), for support. Unlike the facts in Dawson, we conclude that Butler’s gang affiliation was relevant to his motive. See Lay v. State, 110 Nev. 1189, 1196-97, 886 P.2d 448, 452-53 (1994). Butler also contends that evidence of his gang affiliation was not an act or crime contemplated within the meaning of either NRS 48.045(2) or NRS 48.035(3). We conclude that the definition of an act as it is written in both of these statutes is broad enough to encompass gang affiliation as a continuous act. See Black’s Law Dictionary 25 (6th ed. 1990) (defining an “act” as an “[e]xpression of will or purpose, carrying idea of performance; primarily that which is done or doing; exercise of power, or effect of which power exerted is cause; a performance; a deed”). Although Butler was not charged with a gang enhancement, the admission of that evidence was not therefore per se precluded. Compare Qualls, 114 Nev. at 901-02, 961 P.2d at 766, with Tinch, 113 Nev. at 1173, 946 P.2d at 1063.

See Sheriff v. Hawkins, 104 Nev. 70, 75, 752 P.2d 769, 773 (1988) (recognizing that “mere arrests and convictions for misdemeanors may not ordinarily be admitted even for the limited purpose of attacking a witness’s credibility”).

ColLman v. State, 116 Nev. 687, 703, 7 P.3d 426, 436 (2000).

Id.

See McKee v. State, 112 Nev. 642, 646-47 , 917 P.2d 940, 943 (1996); Rowbottom v. State, 105 Nev. 472, 485, 779 P.2d 934, 942 (1989).

 112 Nev. 1172, 1189-90, 926 P.2d 265, 276-77 (1996) (reviewing NRS 174.087, which was replaced in 1997 with NRS 174.233).

Id. at 1190, 926 P.2d at 277 (internal quotation marks and citations omitted).

id.

Butler also contends that the reasonable doubt instruction as set forth in NRS 175.211 that was given to the jury at the close of the guilt phase violated his due process rights. This court has repeatedly affirmed the constitutionality of NRS 175.211 and has done so in light of its impact upon a defendant’s due process rights in particular. See, e.g., Buchanan v. State, 119 Nev. 201, 221, 69 P.3d 694, 708 (2003); Lord v. State, 107 Nev. 28, 38-40, 806 P.2d 548, 554-56 (1991). When doing so, this court has looked at whether the jury was correctly instructed on the defendant’s presumption of innocence and the State’s burden of proof. See, e.g., Middleton v. State, 114 Nev. 1089, 1111-12, 968 P.2d 296, 311 (1998); Bollinger v. State, 111 Nev. 1110, 1114-15, 901 P.2d 671, 674 (1995). Here, the jury was properly instructed regarding both, matters, and we conclude that this issue warrants no further discussion.

State v. Kopp, 118 Nev. 199, 202, 43 P.3d 340, 342 (2002).

Charlie Brown Constr. Co. v. Boulder City, 106 Nev. 497, 502, 797 P.2d 946, 949 (1990), overruled on other grounds by Calloway v. City of Reno, 116 Nev. 250, 993 P.2d 1259 (2000).

Id. at 502-03, 797 P.2d at 949.

Zabeti v. State, 120 Nev. 530, 534, 96 P.3d 773 , 775 (2004); Moore v. State, 117 Nev. 659, 661-62, 27 P.3d 447, 449 (2001).

Layton v. State, 91 Nev. 363, 366, 536 P.2d 85, 87 (1975).

See, e.g., S.N.E.A. v. Daines, 108 Nev. 15, 19, 824 P.2d 276, 278 (1992); Givens v. State, 99 Nev. 50, 54, 657 P.2d 97, 100 (1983), overruled on other grounds by Talancon v. State, 102 Nev. 294, 721 P.2d 764 (1986).

Butler also contends that defense counsel should argue last at the penalty hearing. This court recently rejected this argument in Johnson v. State, 118 Nev. 787, 805-06, 59 P.3d 450, 462 (2002), and his claim is without merit.

 116 Nev. 732, 6 P.3d 987 (2000); see also Evans v. State, 117 Nev. 609, 635-37, 28 P.3d 498, 516-17 (2001).

Hollaway, 116 Nev. at 746, 6 P.3d at 997 (internal citations omitted).

Id.

Id.

Id.

Thomas v. State, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004).

Hernandez v. State, 118 Nev. 513, 525, 50 P.3d 1100, 1108 (2002) (quoting United States v. Young, 470 U.S. 1, 11 (1985)).

Thomas, 120 Nev. at 48, 83 P.3d at 825 (quoting Williams v. State, 103 Nev. 106, 110, 734 P.2d 700, 703 (1987)).

McGuire v. State, 100 Nev. 153, 158, 677 P.2d 1060, 1063-64 (1984).

See Evans, 117 Nev. at 632, 28 P.3d at 514; Leonard v. State, 114 Nev. 1196, 1212-13, 969 P.2d 288, 298-99 (1998).

See NRS 200.035(7).

 102 Nev. 119, 125, 716 P.2d 231, 234-35 (1986).

 100 Nev. at 158, 677 P.2d at 1064.

Butler cites to other instances of alleged prosecutorial misconduct where his objections were generally sustained by the trial court. We have reviewed those remarks and conclude that they do not entitle Butler to relief. In light of our decision to remand Butler’s appeal for a new penalty hearing, those remarks do not warrant further discussion.

Hernandez, 118 Nev. at 535, 50 P.3d at 1115.

Under NRS 177.055(2)(c), we must also consider whether the evidence supports the aggravating circumstance in this case. It clearly does: Butler was convicted of more than one offense of murder in this proceeding. Because we are remanding for a new penalty hearing, we do not reach a determination under NRS 177.055(2)(e) as to whether the death sentence is excessive. If upon remand the State seeks the death penalty and the jury returns a death sentence, we will make that determination with regard to the evidence presented at the new penalty hearing.