[No. B130704. Second Dist., Div. Four. Aug. 14, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN PETER ARCHER, Defendant and Appellant.

[No. B135991. Second Dist., Div. Four. Aug. 14, 2000.]

In re JOHN PETER ARCHER on Habeas Corpus.

COUNSEL

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar and Alan D. Tate, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**EPSTEIN, Acting P. J.**—John Peter Archer appeals his conviction of first degree murder, with a true finding that he personally used a knife in the

commission of the crime. He claims several instances of prosecutorial and judicial misconduct and ineffective assistance of counsel, cumulatively resulting in prejudice to him. He makes numerous other claims of error, but we reach only three. First, we conclude that the trial court erred in admitting the extrajudicial statement of his codefendant, and that admission of that statement violated appellant's constitutional right to confront witnesses. We also conclude that it was error to exclude as hearsay the testimony of a witness who heard appellant's end of a telephone conversation, as that evidence was offered for a nonhearsay purpose. Finally, we conclude that the court erred in admitting several knives, books and videotapes which had only marginal relevance and great potential for prejudice. The first of these errors, when considered in light of the others, cannot be deemed harmless beyond a reasonable doubt. For this reason, we reverse the judgment of conviction.

### Factual and Procedural Summary

At approximately 8:30 p.m. on November 16, 1992, John Pate left his grandmother's house, where he resided. He told his brother, Franklin Pate, that he was going somewhere with Victor Baserga and would be right back. Franklin never heard from his brother again.

On several occasions beginning in November 1992, Baserga spoke to others about John Pate's disappearance and stated that he killed John Pate or had him "taken care of."

Appellant's home was searched in March and June 1994. Among the items seized were knives found in the house, the backyard, and the workshop, and two pairs of tennis shoes. The investigating officer asked John Pate's brothers to look at the shoes. Franklin Pate recognized one pair as the shoes John Pate had on when he left their grandmother's house on the day of his disappearance. Two bloodstains were found on that pair of shoes.

Appellant's 1989 blue Ford Escort also was seized. Fibrous material recovered from the car was determined to be human head hairs and pieces of soft body tissue with attached human hair. The roots were putrid, indicating they were taken from a body after death. Two brownish stains collected from the rear seat area were determined to be blood.

In February 1995, Baserga was arrested. After waiving his constitutional rights, Baserga gave a statement to police in which he admitted involvement in the killing. He told police he took John Pate to 4181 La Madera Avenue in El Monte (which is appellant's address), where Pate was stabbed and died. Baserga said he returned to that address one week later. He saw John Pate's

body in the rear yard, with dirt on top of it. The head was missing from the body. The body was moved in a wheelbarrow to the back of a Ford Escort hatchback (with appellant's license plate number), and taken to a location. There the hands were sawed off, put in plastic grocery bags, and thrown in some bushes. The saw blade was hidden under some rocks.

Baserga took police to the location where the body had been dumped. No body was found, but the saw blade was found under a rock. The location was a dry wash in Claremont where, in March 1994, human skeletal remains had been found with the head and hands missing.

Appellant's house was searched again in March 1995. A dog trained to locate human body remains was used to assist in a search of the backyard. The dog alerted to one location at the rear of the yard, but police officers found nothing material at that site. The dog alerted at a second site in the yard. As they dug at the second location, the officers detected the odor of decomposing flesh. This location coincided with Baserga's description of where the body had been buried. No human remains were found there.

DNA testing of the remains and the hair and tissue samples taken from appellant's car, when matched with DNA from John Pate's natural parents, indicated that the samples could have originated from the parents' biological offspring. The detective who informed appellant of the evidence found in the car reported that appellant told him, "It can't be. I washed the car twice."

Appellant and Baserga were charged with the first degree murder of John Pate, with the allegation that they each personally used a knife in the commission of the crime. Baserga also was charged with the special circumstance of lying in wait. At the joint trial, Baserga's statement to the police was admitted in the redacted form summarized here. The jury found both men guilty of first degree murder and found the personal use allegations true. The jury found the special circumstance allegation against Baserga not true. Appellant filed a timely appeal from the judgment of conviction, and also filed a petition for habeas corpus addressing many of the same issues (case No. B135991). Our decision in this appeal renders the habeas corpus petition moot.

DISCUSSION

I

Appellant claims it was prejudicial error to admit the extrajudicial statement of codefendant Baserga, which implicated appellant. Respondent argues that appellant waived this error by failing to object at trial; that admitting it was not error; and that even if it were, the error was harmless.

■ We begin with the claim of waiver. More precisely, respondent's theory is that appellant forfeited a claim of *Aranda/Bruton*[1] error by failing to raise that objection at trial. (See *People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) Before trial, the prosecution moved for introduction of Baserga's confession in redacted form, arguing that the redaction would avoid the "*Aranda* issue." Appellant objected to introduction of the statement, and sought severance of his case from Baserga's, or alternatively, the impanelment of two juries. The court refused to sever the cases or provide separate juries, and denied Baserga's motion to exclude the statement. Although appellant did not then raise any specific objection to the redaction proposed by the prosecution, considered in the context of the pretrial proceedings, we conclude that he adequately preserved the issue of *Aranda/Bruton* error.

We turn to the claim of constitutional error. In *Bruton v. United States, supra,* 391 U.S. 123, the Supreme Court held that a defendant's Sixth Amendment right of cross-examination is violated by the admission of a nontestifying codefendant's confession implicating the defendant. Although a jury may be instructed to disregard the confession in determining the nondeclarant defendant's guilt or innocence, the court recognized that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.] Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (*Id.* at pp. 135-136 [88 S.Ct. at pp. 1627-1628].) Three years earlier, the California Supreme Court had reached a similar conclusion on nonconstitutional grounds. (*People v. Aranda, supra,* 63 Cal.2d at pp. 528-530.)

In *Richardson v. Marsh* (1987) 481 U.S. 200 [107 S.Ct. 1702, 95 L.Ed.2d 176], the United States Supreme Court limited *Bruton,* holding that the confrontation clause is not violated by the admission of a codefendant's confession that has been redacted "to eliminate not only the defendant's name, but any reference to his or her existence," even if the confession incriminates defendant when considered in conjunction with other evidence. (481 U.S. at p. 211 [107 S.Ct. at p. 1709].) While *Bruton* required that the admission be "powerfully" incriminating, *Richardson* required that it also be "incriminating on its face . . . ." (481 U.S. at p. 208 [107 S.Ct. at pp. 1707-1708].)

---

[1] *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] and *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476].

The confession in *Richardson* was not incriminating on its face, but only became so when linked with evidence introduced later at trial. The case involved the joint murder trial of Clarissa Marsh and Benjamin Williams. At their joint trial, Williams's confession was admitted, redacted to eliminate any reference to Marsh, and to omit all indication that anyone other than Williams and a third person had participated in the crime. In the redacted confession, Williams indicated that he and the third person had discussed the murder in the front seat of the car as they drove to the victims' house. The redacted confession contained no indication that Marsh was in the car. Later in the trial, Marsh testified that she was in the backseat of the car, although she also testified that she did not hear the conversation because the radio was on and the speakers were close to her head. Considered with Marsh's testimony that she was in the car, Williams's confession could have helped convince the jury that Marsh knew about the murder in advance and therefore knowingly participated in the crime. (*Richardson v. Marsh, supra,* 481 U.S. at pp. 201-203 [107 S.Ct. at pp. 1704-1705].)

The Supreme Court held that in such a case, where the confession is not incriminating to the nontestifying defendant except when linked with evidence introduced later at trial, the judge's instruction to disregard the evidence in assessing the defendant's guilt "may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget." (*Richardson v. Marsh, supra,* 481 U.S. at p. 208 [107 S.Ct. at p. 1708].)

In *People v. Fletcher* (1996) 13 Cal.4th 451 [53 Cal.Rptr.2d 572, 917 P.2d 187], our Supreme Court considered a question left open by *Richardson*—whether it is sufficient to avoid violation of the confrontation clause to edit a codefendant's extrajudicial statement by replacing references to the non-declarant's name with pronouns or similar neutral and nonidentifying devices. The court concluded that "the efficacy of this form of editing must be determined on a case-by-case basis in light of the other evidence that has been or is likely to be presented at the trial. The editing will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun." (13 Cal.4th at p. 456.)

The United States Supreme Court reached a similar conclusion in *Gray v. Maryland* (1998) 523 U.S. 185 [118 S.Ct. 1151, 140 L.Ed.2d 294].) The confession in *Gray* referred directly to the existence of the nonconfessing defendant. It was redacted by removing the defendant's name and replacing it with either the word "deleted" or a blank space set off by commas. "The

inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson*'s words, 'facially incriminat[es]' the codefendant. *Id.*, at 209 [107 S.Ct. at p. 1708] (emphasis added). Like the confession in *Bruton* itself, the accusation that the redacted confession makes 'is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.' 481 U.S., at 208 [107 S.Ct. at pp. 1707-1708]." (523 U.S. at p. 196 [118 S.Ct. at p. 1157], italics omitted.)

 In reviewing the statement in this case, we find guidance in *People v. Fletcher, supra*, 13 Cal.4th 451: "[W]hen the prosecution proposes to redact one defendant's confession to substitute pronouns or similar neutral terms for the name of a codefendant, the 'contextual implication' approach provides a practical accommodation of the competing interests at stake—the non-declarant's constitutionally protected rights under the confrontation clause and the interests of the state in the fair and efficient administration of the criminal justice system. We hold, therefore, that editing a nontestifying codefendant's extrajudicial statement to substitute pronouns or similar neutral terms for the defendant's name will not invariably be sufficient to avoid violation of the defendant's Sixth Amendment confrontation rights. Rather, the sufficiency of this form of editing must be determined on a case-by-case basis in light of the statement as a whole and the other evidence presented at trial." (*Id.* at p. 468.)

In our case, Baserga's statement was redacted to delete any mention of appellant by name, but appellant is unmistakably implicated in several aspects of the statement. Baserga told the investigator that he picked up the victim, John Pate, and suggested to Pate that they go to 4181 La Madera Avenue. According to Baserga, "[t]he plan was to attack John Pate by surprise as he walked into the back yard of 4181 La Madera Avenue." The jury previously had heard testimony that 4181 La Madera was appellant's home address. Baserga stated he knew that bringing Pate to that address "was gonna set him up."

When Baserga and Pate reached that address, Baserga opened the gate and walked into the patio area; "Pate was behind me, and then Pate was stabbed." Pate "tried to escape, but I didn't know what to do, so I held him." Baserga stated that he stabbed Pate in the arm, "maybe twice . . . ." Baserga believed John Pate was stabbed more than 10 times, "mostly in the chest or in the stomach." These portions of the statement leave no doubt that

the serious stab wounds were inflicted by someone other than Baserga, and that this other person was waiting at appellant's house for Baserga to arrive with Pate.

Baserga explained that the stabbing began almost immediately after he brought Pate to the house. When Baserga went inside to change his clothes, Pate was still alive, although he was having trouble breathing and may have been dying. Baserga did not go back outside before leaving the house that night; "I didn't feel too good. I didn't even want to go back there."

Asked what happened to Pate's body after he was stabbed, Baserga replied: "He was left in the back yard, I guess under some moss or dirt or buried. Then I—yeah, but—not buried like—like was dug a hole, just like he covered him up." Five or seven days later, Baserga went back to 4181 La Madera Avenue to get rid of the body. It was in the backyard, in a section with a little gate, with earth over it. Baserga moved the dirt off the body. "I was looking at him and the—I knew it was there—once I cleared some of the dirt. I got—at that time I—I kind of got grossed out because that's when I noticed that he didn't have a head."

The investigator asked Baserga whether he "use[d] something to move [the body] from the ground there in the back yard and put it in the back of the hatchback, the little Ford Escort with a plate number 2 MNA 526?" Baserga replied: "Yeah. Used the wheelbarrow to move the body and put it in the back of the car." The jury previously had heard testimony that appellant's car was a 1989 blue Ford Escort with that same license number.

Baserga's statement was not redacted by using neutral pronouns or symbols to indicate deletions. Instead, pronouns and names were omitted without any indication of an omission. The resulting ungrammatical sentences raise as strong a suspicion that names have been omitted as a neutral pronoun or symbol would have done. For example, Baserga described the disposal of the body: "Well, first broke open, opened up the lock with bolt cutters, and then at that time I held the gate and drove in and just parked. And then opened the back of the car and got the body out and left the body near some rocks."

Baserga's statement was probably redacted as much as it could have been. But, as redacted, it informed the jury that Baserga planned the crime with someone else, that the other person was waiting at appellant's house for Baserga to arrive with Pate, and that the other person stabbed Pate at least eight times in the chest or stomach, while Baserga stabbed him only twice in the arm. Someone other than Baserga moved the body from the patio to the back corner of appellant's yard and covered the body with dirt. Someone

other than Baserga cut the head off the body and disposed of it. The body was moved from that location by Baserga and someone else, in appellant's car. Baserga and this someone else removed the body from appellant's car, sawed off the hands, left the body near some rocks, and drove away in appellant's car.

While appellant's name is not mentioned in the statement, the existence of another participant is obvious from the statement itself. This distinguishes our case from *Richardson*. Moreover, appellant's home address and car license plate number figure prominently in the description of the commission of the crime. A juror who wonders who the other participant is "need only lift his eyes to [appellant], sitting at counsel table, to find what will seem the obvious answer, . . ." (*Gray v. Maryland, supra*, 523 U.S. at p. 193 [118 S.Ct. at p. 1155].) The statement, even with redaction, facially incriminates appellant. "[T]he average juror, viewing the confession in light of the other evidence introduced at trial, could not avoid drawing the inference that the nondeclarant is the person so designated in the confession and the confession is 'powerfully incriminating' on the issue of the nondeclarant's guilt." (*People v. Fletcher, supra*, 13 Cal.4th at p. 467.) Admission of the statement in this form was a violation of appellant's Sixth Amendment right of confrontation.

█ Whether denial of a defendant's constitutional right of confrontation requires reversal is evaluated under the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1128 [240 Cal.Rptr. 585, 742 P.2d 1306]; *Lilly v. Virginia* (1999) 527 U.S. 116, 139-140 [119 S.Ct. 1887, 1901-1902, 144 L.Ed.2d 117].) That analysis generally depends on whether the properly admitted evidence is so overwhelming as to the guilt of the nondeclarant that a reviewing court can say the constitutional error is harmless beyond a reasonable doubt. (See *People v. Anderson, supra*, 43 Cal.3d at p. 1129.) We therefore turn to appellant's other claims of error as to the admission and exclusion of evidence.

## II

A. *Refusal to allow impeachment by Alicia Lopez*

At trial, Francisco Hernandez testified that while in prison, he frequently telephoned his friend, Alicia Lopez, who lived next door to appellant. Appellant was at Ms. Lopez's house on one occasion when Hernandez called. According to Hernandez, appellant got on the telephone and Hernandez asked him, "What's going on?" By this question, Hernandez was

inquiring about John Pate's murder. Hernandez testified that appellant told him, "That he isn't coming back." Hernandez also testified that he sat near appellant on a county jail bus in June 1994. Hernandez asked appellant what really happened. According to Hernandez, appellant replied that John Pate went to appellant's house, and appellant stabbed him.

During cross-examination of Ms. Lopez, who was present with appellant during his telephone conversation with Hernandez, appellant's counsel asked: "And, in fact, this conversation [Hernandez] had with John Archer, John Archer was saying—John Archer was denying ever being involved, correct?" The prosecutor objected, first on the ground that the question called for a self-serving statement. The court overruled that objection. Appellant asked, "In fact, John was denying ever being involved with that murder, correct?" The prosecutor then objected to the question as calling for hearsay. Appellant asserted the statement was being sought to impeach Hernandez's testimony, and therefore was not subject to exclusion as hearsay. The court sustained the objection. This was error.

Ms. Lopez's testimony regarding appellant's side of the telephone conversation was not being offered for the truth of the matter—that appellant was not involved with the murder. It was being offered for the limited purpose of impeaching Hernandez's testimony as to what appellant said in the conversation. It was not hearsay (Evid. Code, § 1200), and its exclusion was improper.

The issue was revisited during Detective Reneer's testimony about the taped statement he took from Hernandez in January 1996. According to Detective Reneer, Hernandez told him about two conversations he had with appellant. The first was the telephone call Hernandez made from prison to Ms. Lopez's house. Hernandez told the detective that during the telephone conversation, "Archer said that he killed him, that he hid the body somewhere."

Hernandez told the detective that the second conversation took place at the Pomona court. Hernandez said that appellant told him the murder took place at appellant's home, and that appellant said that he did it. Hernandez said that appellant told him that he "expired" Pate, and that Pate asked appellant "Why?"

During cross-examination, Detective Reneer acknowledged that Hernandez had not told him the second conversation took place on the county jail bus, and that the first time he heard that was during Hernandez's testimony at trial. He also acknowledged that, contrary to Hernandez's trial testimony,

he did not tell the detective that appellant said he stabbed Pate. During the taped interview, Hernandez told the detective that Pate "got hit on the head with something."

Appellant again sought to introduce Ms. Lopez's testimony that during appellant's telephone conversation with Hernandez, she heard appellant say that he was not involved in Pate's murder. The court refused to allow that testimony.

Ms. Lopez's testimony about what she heard appellant say to Hernandez was sought for the limited purpose of impeaching Hernandez's report of what appellant said to him. Appellant was not offering the statement for the truth of the matter stated. The statement was subject to a limiting instruction, but as to the purpose for which it was offered, it was not hearsay and should not have been excluded on that basis.

B. *Evidence about knives*

Police recovered two knives from appellant's backyard, three knives from his bedroom, two knives from his workshop, and two knives from his storage locker. All the knives were tested for blood. Only one knife, exhibit No. 21, which was found in the storage locker, showed what the criminalist called a "presumptive positive" reaction for blood. That means it reacted to the test chemicals, although certain plants such as potatoes, turnips, or cucumbers could have caused the same result. The criminalist attempted to determine whether the blood was human, but did not get a reaction on that test. There were two possible interpretations: either there was not enough sample on the knife to get a result, or the sample was not human blood. Baserga identified one of the knives found in appellant's house as resembling the knife he used to stab Pate.

■ Appellant objected to admission of the knives for lack of relevance. The prosecutor argued that the knives were relevant to the planning that went into the murder and to the availability of weapons. We disagree.

The only knives which had any relevance to the crime charged were the knife Baserga identified as resembling the one he used to stab Pate, and the knife which had a positive reaction to the test for blood. The knife Baserga identified was not shown to be unique or difficult to acquire, nor was there such a showing as to the knife that was presumptively positive for blood. Hence there was no issue as to appellant's access to such weapons or his need to stockpile knives in order to commit the murder. "Evidence of possession of a weapon not used in the crime charged against a defendant

leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant." (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360 [129 Cal.Rptr. 844].) Admission of the knives other than the two which had some arguable relevance to the case created a risk of that same inference in this case. The court abused its discretion in overruling appellant's objection.

## C. *Admission of books and videotapes*

■ Appellant also asserts error in the admission into evidence of several videotapes, books, and catalogs seized from his home and storage locker. In an astounding example of overreaching, the prosecutor presented detailed testimony by Officer Whary about these materials and then had them introduced into evidence. The materials included a book entitled The Poor Man's James Bond, with a chapter entitled "Knife Attack." Also described and introduced into evidence were four catalogs published by Palladin Press. Over appellant's objection, the prosecutor elicited testimony as to specifically marked items advertised for sale in these catalogs, including videotapes entitled Get Even; Make Them Pay; Surviving a Street Knife Fight; Realistic Defensive Tactics; The War Years Guide to Knife Fighting; and Slash and Thrust. Also marked by the prosecutor and read out to the jury were titles of articles and books offered for sale, including Trained to Kill, Soviet Style; Techniques of Silent Killing; Explosives and Demolitions; How to Kill; Kill Without Joy; Ninja Hands of Death; Ninja Death Touch; Put Them Down, Take Them Out, Knife Fighting Techniques from Folsom Prison; Knife Fighting and Related Hassles; How to Surviv[e] a Real Knife Fight; Slash and Thrust; Knives and Knife Fight. In addition, the officer testified that he seized books entitled Home Workshop Silencers; Disposable Silencers; and The Antichrist Cook Book, which the officer described as a manual dealing with "a variety of topics from different types of fighting to explosives to poisons, all types of subjects." An article on the application of hand weapons and knives was highlighted. Also described were two Phoenix Systems catalogs from which various weapons including knives and tactical batons could be ordered, and an instructional videotape on how to manufacture silencers, entitled Whispering Death.

Appellant objected to the admission of these items, on grounds of relevance and Evidence Code section 352. The prosecutor responded: "Many of the items are how to books on how to commit murder with a knife. In fact, the evidence is that before the murder was committed, apparently it was discussed among the defendants how were they going to commit it in the first place. [¶] The fact that the books on silencers are present gives an

indication that maybe . . . a gun that is, with a silencer was at one point considered as a weapon, and that's why I believe it's relevant."

Some sections of the materials dealt with the use or purchase of knives. But the prosecutor did not limit the evidence to those materials. He included numerous other items with no relevance whatsoever to the issues at trial. We are unable to ascertain the probative value of these materials. There was no indication that the murder was performed in an unusual manner which required special training. Nor was there any indication that an exotic or unusual knife was used for the murder, which might have been ordered from a specialized catalogue such as the ones seized from appellant. All that can be shown from this large amount of reading and videotape material is that appellant had an interest in weapons and methods of using them. This interest has little or no probative value as to whether appellant murdered John Pate. But given the large amount of materials and their inflammatory nature, there is a strong possibility that the jury could infer that appellant had a propensity to act in accordance with his interests. The evidence was inadmissible for that purpose. (Evid. Code, § 1101, subd. (a).) This serious possibility of prejudice outweighs the very limited probative value of the books and videotapes. The trial court abused its discretion in denying appellant's motion to exclude the materials pursuant to Evidence Code section 352.

Not one of these evidentiary errors, by itself, resulted in a miscarriage of justice requiring reversal of the judgment. (Evid. Code, § 352.) But, in evaluating the prejudice caused by the violation of appellant's constitutional right to confrontation, we must consider only evidence that was properly admitted, or which should have been admitted but was not. We turn to that evaluation.

### III

■ Where, as in this case, there has been a violation of an appellant's constitutional right to confrontation, reversal is required unless we can conclude that the error was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. 18, 24 [87 S.Ct. 824, 828].) This familiar rule is a reiteration by the Supreme Court of the standard it set out in *Fahy v. Connecticut* (1963) 375 U.S. 85, 86-87 [84 S.Ct. 229, 230, 11 L.Ed.2d 171]: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." More recently, the court has formulated the inquiry as "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [113 S.Ct. 2078, 2081, 124 L.Ed.2d

182].) Under any of these formulations, we cannot declare that the error in this case was harmless beyond a reasonable doubt.

Baserga's improperly admitted statement was strong and impactful. The statement, and the unmistakable inferences from it, established that John Pate was murdered according to a plan by which Baserga drove Pate to appellant's house where he was killed by another person. This other person moved the body to the back of appellant's yard, cut the head off, and covered the body with dirt. Several days later, Baserga and this other person put the body in appellant's car, drove to a location in Claremont, cut the hands off the body, and left it there.

The jury was instructed in terms of CALJIC No. 2.08 that Baserga's statement should not be considered against appellant. But in closing argument, the prosecutor referred to Baserga's statement as establishing appellant's guilt. He emphasized that Baserga stated the murder took place at appellant's home, that the body was buried in appellant's yard, and that it was later moved in appellant's car.

Baserga's counsel went even farther, emphasizing that his client never implicated appellant because appellant would have threatened him if he had: "[N]owhere in that statement did you hear him refer to the co-defendant in this case, John Archer. Mr. Baserga, you have no evidence before you that Mr. Baserga ever implicated Mr. Archer, nor did he take the stand and testify against him." Counsel then explained: "I think you got an idea about what kind of person Mr. Archer is just by some of his actions here in court. He threatened one of the witnesses here in court, which you have evidence of. He said, you're dead. Now, if he threatened a witness in court for testifying [against] him, can you imagine what type of threats he might have made to someone in custody who is on trial with him?"

Appellant's objection to this argument was overruled. The jury was left with the impression that Baserga did not mention appellant in his confession because of appellant's threats to Baserga. With this argument, even the redactions in the statement were used to implicate appellant.

Other than Baserga's statement, one of the strongest pieces of evidence of appellant's guilt was Hernandez's statement to Detective Reneer that in two different conversations, appellant said he killed Pate, and Hernandez's trial testimony to similar effect. There were some inconsistencies between these reports about the conversations, but according to Hernandez, one took place on the telephone, and the other took place in person. As we have explained, appellant was improperly precluded from impeaching Hernandez's credibility by Alicia Lopez, who heard appellant's side of the telephone conversation. According to appellant's offer of proof, Ms. Lopez would have testified

that appellant denied any involvement in the murder. In light of the court's error in precluding this impeachment evidence, we cannot indulge the usual presumptions in favor of the judgment as to this particular evidence.

Putting aside Baserga's statement and Hernandez's report that appellant admitted the killing, the remaining evidence of appellant's guilt, while sufficient, is not overwhelming.

We begin with the evidence we consider the strongest: a pair of sneakers identified as belonging to John Pate was found in appellant's closet. There were two bloodstains on the sneakers, and one of the stains was determined to be human blood. The criminalist did not determine whose blood it was.

Fibrous body tissue with human hair from a dead body was found in appellant's car. DNA testing confirmed this tissue could have been from John Pate. Detective Graves testified that he spoke to appellant in February 1995, after Baserga gave his statement. During the interview, Detective Graves told appellant about the hair and tissue sample that was recovered from his car. According to the detective, appellant told him, "It can't be. I washed the car twice." Appellant testified that he never said anything about cleaning the car twice during that interview.

Small bloodstains were found in various locations in appellant's backyard one and one-half years after Pate's disappearance. The criminalist who tested these stains could not ascertain whether these stains were of human blood. A dog trained to detect human remains alerted in two areas in appellant's backyard. While digging in one of those areas, officers detected the odor of decomposing flesh. No human remains were found during the search.

Maryann Carter testified that on more than one occasion, she overheard conversations in which Baserga, appellant, and her boyfriend Danny Cruz talked about killing John Pate. They were not talking about details, just planning. On one of these occasions, in February or March 1992, they seemed to be accusing her of "opening my mouth or something to people, . . ." She told appellant she was not the one doing the talking, that it was Baserga. Appellant then said, "Well, now, we'll have to do it and make it look like an accident so no one will know." Pate disappeared eight months later. Danny Cruz testified to those same conversations. He also said he did not believe them, and he never thought Baserga and appellant would kill anyone.

Diane Figueroa, who lived next door to appellant, testified that appellant told her he thought Pate was killed "because he was a rip-off" and owed

people money. According to Ms. Figueroa, appellant said Pate "got what he deserved." But Ms. Figueroa explained that "Everybody said that."

This evidence is sufficient to support an inference of guilt and a murder conviction. But the strongest evidence is that which was improperly admitted or inadequately tested: Basèrga's confession, and Hernandez's statement of what appellant told him. Moreover, other improperly admitted evidence— the knives, books, and videotapes—presented a substantial danger of undue prejudice to appellant. Having reviewed the entire record, we conclude there is a reasonable likelihood that the *Aranda/Bruton* violation contributed to appellant's conviction. Because of that, the error in admitting that confession was not harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. 18, 23-24 [87 S.Ct. 824, 827-828].) Reversal is required.

### DISPOSITION

The judgment is reversed. The petition for writ of habeas corpus is dismissed as moot.

Hastings, J., and Curry, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 29, 2000.