136 Nev., Advance Opinion 62

IN THE SUPREME COURT OF THE STATE OF NEVADA

STEVEN TURNER,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 76465

FILED

OCT 01 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of conspiracy to commit burglary, attempted burglary while in possession of a firearm or deadly weapon, two counts of attempted murder with use of a deadly weapon, and battery with use of a deadly weapon resulting in substantial bodily harm. Eighth Judicial District Court, Clark County; Mark B. Bailus, Judge.

*Affirmed.*

Darin F. Imlay, Public Defender, and Deborah L. Westbrook, Chief Deputy Public Defender, Clark County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and John T. Niman, Deputy District Attorney, Clark County,
for Respondent.

_____

BEFORE THE COURT EN BANC.

20-35951

## OPINION

By the Court, SILVER, J.:

Under *Bruton v. United States*, the admission of a nontestifying codefendant's inculpatory statement that expressly implicates the defendant violates the Confrontation Clause. 391 U.S. 123, 135-36 (1968). In this case, we are faced with an issue of first impression regarding the preservation of a *Bruton* challenge—appellant asserts that his Confrontation Clause rights under *Bruton* were violated when the district court admitted his codefendant's statements, but the State contends that the appellant waived any *Bruton* challenge. We agree that under these particular facts, appellant waived the *Bruton* challenge. Appellant's actions of cooperating to redact the statements, agreeing to the redacted statements' admission, indicating an intent to no longer pursue the *Bruton* challenge, and failing to thereafter object to the statements showed a lack of intention to preserve the argument for appeal. And although we agree with some of appellant's other points of error, we ultimately affirm the verdict, as those errors were harmless and do not amount to cumulative error warranting reversal.

## FACTS

Eric Clarkson heard noises on his back patio, just outside his bedroom window, around 3:30 a.m. That patio was covered and screened, and separated from the rest of the backyard. The lights inside his house were off, and through the window, Clarkson was able to see a young man, although he could not see the intruder's face. Clarkson called 9-1-1 and alerted his housemate, Willoughby Potter de Grimaldi. Grimaldi looked out the window and, like Clarkson, saw a man on the patio but could not see his face. Grimaldi noted the intruder was wearing a cap and appeared to be

SUPREME COURT
OF
NEVADA

(O) 1947A

2

cocking a shotgun. Someone then began to beat on the front door, and Grimaldi looked out a window to see another man, who ran away down the street. Grimaldi also thought he saw a third man pass by his bedroom window.

Officers Robertson and Grego-Smith arrived approximately five minutes after receiving the call from dispatch and approached the house quietly. They briefly checked the sides of the house before Clarkson let them inside. Leaving the lights off, the officers moved through the home and opened the back door to check the backyard. The intruders immediately opened fire. At least two bullets flew into the home before the officers could react, narrowly missing Grimaldi and Clarkson. One shot crossed the room while the other exploded mid-air, blowing shrapnel throughout the area. Grimaldi described one shot as appearing as a "shooting star" while the other exploded like "fireworks." The officers could hear that one of the shots was from a high-powered rifle. Another bullet hit Officer Robertson in the upper thigh, severely damaging his femur. Officer Robertson collapsed while Officer Grego-Smith returned fire.

Additional officers arrived on the scene with a K-9, who located Clemon Hudson in the backyard. Officers approached to find Hudson lying on the ground, injured, with a shotgun between his legs. Officers also began patrolling a mile-wide perimeter around Clarkson's home, looking for other suspects. After someone reported a suspicious person traveling through a backyard, officers located appellant Steven Turner walking down a street within the perimeter. He was bleeding and had what appeared to be a bullet wound to his leg, although Turner told officers he had been injured while jumping over a fence. Officers transported him to UMC, where doctors, including Dr. Amy Urban, examined him for a possible gunshot wound.

Doctors found shrapnel in Turner's leg and noted the presence of "stippling" on his leg, foot, and ankle.

Back at Clarkson's home, officers found a damaged 12-gauge Mossberg pump-action shotgun, an SKS Yugo Rifle, and a Beretta handgun in the patio area. Officers also located Hudson's vehicle, with the keys in the ignition, outside Clarkson's home. Inside the car they found two cell phones, a gun magazine, a loose round cartridge, and Turner's two dogs. A later trace of one of the phones led to Turner's residence. Officers also recovered surveillance video showing Turner traversing yards, parking lots, and fences on foot immediately after the incident.

Turner and Hudson each gave voluntary statements to police, admitting to going to the home to steal marijuana. Each blamed the other for contriving to burglarize the home and for bringing the guns.[1] Turner told detectives he followed Hudson over the wall, through the yard, and up to the patio area. The shooting then broke out, and Turner claimed he fled the yard and waited on a couch in a nearby backyard for a time before setting out for a friend's house, at which point he was apprehended. Turner admitted seeing the SKS in Hudson's car. He told detectives the SKS had previously been stolen from his uncle and accurately described the gun to detectives, but he denied bringing the gun. Turner claimed the burglary was Hudson's idea, and Hudson carried both the SKS and the shotgun. Turner denied ever holding or firing a weapon at the scene. He also denied working with a third person during the crime. Hudson, meanwhile, blamed

---

[1]Although Turner and Hudson each referred to the other by his street name when speaking to police, the parties do not contest that each was referencing the other, and we therefore use their given names.

Turner for contriving to burglarize the home and stated they both fired the weapons at police.

Turner and Hudson were indicted and tried jointly. The State charged them under three alternate theories: directly committing the crimes, aiding or abetting, and conspiracy. Turner conceded to committing conspiracy and attempted burglary but contested the remaining charges. At trial, he argued that he merely went to the house and stayed at the back of the yard, and that he ran when the shooting broke out. Turner also argued that three or more people had been in the yard that night, that he did not match the descriptions of the intruders, and that the State failed to connect him to the crimes.

Hudson and Turner filed a pretrial motion to sever, arguing that their statements to detectives inculpated each other such that a joint trial would violate *Bruton v. United States*, 391 U.S. 123 (1968). The district court initially denied the motion without prejudice, and the State redacted the statements to remove names and, to the extent possible, references to other persons. At subsequent status checks, Turner agreed with the State's redactions but proffered additional redactions, and later he stated "we've submitted our proposed redactions. If Your Honor is inclined to not sever the case we would . . . I guess not renew." The court indicated it would review the redacted statements, and Turner and the State continued to work toward satisfactory redactions.

At a later status check, Turner acknowledged receiving and reviewing the redacted statements and stated that while he no longer challenged the admission of his own statements, he "may have some additional motion practice in the case" regarding his *Bruton* challenge to the admission of Hudson's statements.

Turner did not renew the motion to sever. At trial Turner requested a limiting instruction, and the district court accordingly instructed the jury to use Hudson's statements only as evidence against Hudson. Turner did not object to the statements' admission. Turner's redacted statements were likewise admitted into evidence.

State witnesses could not link the DNA or fingerprint evidence recovered from the scene to Turner. However, they found Hudson's DNA on blood splatters and a beanie hat found at the scene, as well as his right-hand fingerprints on the Mossberg shotgun. Firearms and toolmark expert Anya Lester compared the guns to evidence found at the scene and described her process for test firing a gun: shooting the gun into a water tank and then examining the fired bullets and ejected cartridges. She determined that the Mossberg shotgun had been fired at the scene but was unable to test that gun because it had been damaged. While Lester could not conclusively establish that someone fired the SKS at the scene, she testified the cartridge and ammunition evidence was consistent with the SKS having been fired. Lester also opined that both guns would require two hands to fire, and explained the SKS had a trigger pull of approximately five pounds. Lester further addressed skin stippling from a gunshot, as did Dr. Amy Urban. Dr. Urban also testified to Turner's injury and the skin stippling on his leg.

The State used the stippling evidence during closing argument to counter Turner's defense that he had stayed in the back of the yard away from the shooting, by arguing that the stippling placed Turner closer to the gunfire. The State used Turner's and Hudson's statements to argue that only two people committed the crime and that Turner was the other person mentioned in Hudson's redacted statements.

The jury convicted Turner and Hudson on all counts, and the court sentenced Turner to an aggregate total of 480 months in prison with parole eligibility after 168 months. Turner moved for a new trial, in relevant part on grounds that the district court should have severed the trial and that the joint trial violated *Bruton*, but the court denied the motion. Turner appeals.[2]

## DISCUSSION

In this opinion, we first address the circumstances under which a party preserves a *Bruton* challenge for appeal, and we conclude Turner waived those arguments here. We next consider whether the district court improperly admitted Lester's and Dr. Urban's expert testimony regarding stippling. We agree that the district court abused its discretion by admitting Lester's unnoticed stippling testimony, but the error was harmless in light of Dr. Urban's testimony and the medical records, and Turner fails to show plain error as to Dr. Urban's testimony. Finally, we address whether the State engaged in prosecutorial misconduct and conclude that while there were several instances of misconduct, it was ultimately harmless in light of the evidence adduced at trial.[3] For those same reasons, we conclude cumulative error does not warrant reversal.

---

[2]This case is before this court on a petition for review of a decision by the court of appeals.

[3]Turner also argues that the presence of uniformed officers in the courtroom prejudiced the proceedings and warrants reversal. However, the mere presence of officers in a courtroom does not demonstrate prejudice, and the record is insufficient for us to determine whether prejudice otherwise resulted here. *See Jones v. Davis*, 890 F.3d 559, 571 (5th Cir. 2018). We therefore do not reach this issue. *See Johnson v. State*, 113 Nev. 772, 776, 942 P.2d 167, 170 (1997) ("We cannot properly consider matters not appearing in [the] record.").

*Whether Turner waived his Bruton argument*

     *Bruton* provides that the admission of a nontestifying codefendant's inculpatory statement that expressly implicates the defendant violates the Confrontation Clause. 391 U.S. 123, 135-36 (1968). Turner argues that allowing Hudson's redacted statements at the joint trial violated his constitutional rights pursuant to *Bruton*. The State counters that Turner waived his *Bruton* challenge by stating, before trial, that he had no objections and then failing to object during trial to the statements' admission. Turner contends that he preserved the *Bruton* challenge by filing a motion to sever, expressly reserving the right to re-raise the argument later, and moving for a new trial.

     The arguments raise a novel issue for this court. Namely, whether a defendant waives or forfeits a *Bruton* argument where the defendant moves to sever the trial on *Bruton* grounds but thereafter cooperates to redact the statements and neither objects to the statements at trial nor renews the *Bruton* argument before the admission of the statements to the jury. The United States Court of Appeals for the Tenth Circuit addressed a similar situation in *United States v. Sarracino*, 340 F.3d 1148 (10th Cir. 2003). There, three defendants were jointly tried. *Id.* at 1158. One defendant moved for severance before trial under *Bruton*, which the court denied. *Id.* The defendant thereafter agreed to cooperate with the other defendants and the State to redact the challenged statements and did not object to the statements' admission at trial. *Id.* at 1159. But when agreeing to cooperate with the efforts to redact the statements prior to trial, the defendant clarified on the record that he did not waive his objection to the joint trial by cooperating. *Id.* The Tenth Circuit concluded that, under

SUPREME COURT
OF
NEVADA

(O) 1947A

8

these facts, the defendant's pretrial "position was clear" and that counsel did not waive the severance issue before trial. *Id.* As to whether failure to object at trial caused waiver, the court called the issue "close" but ultimately concluded the argument was "sufficiently preserved" without further explanation. *Id.*

Similarly, the California Court of Appeal considered whether a defendant waived a *Bruton* challenge by failing to object at trial. *People v. Archer*, 99 Cal. Rptr. 2d 230, 233 (Ct. App. 2000). There, the prosecutor moved to enter the codefendant's redacted statement into evidence. *Id.* Defense counsel objected prior to trial and unsuccessfully moved to sever the trial. *Id.* While the appeals court did not provide a detailed explanation, the court concluded "in the context of the pretrial proceedings" that counsel's pretrial actions sufficiently preserved the argument for appeal. *Id.* Conversely, in *United States v. Kaatz*, the Court of Appeals for the Tenth Circuit concluded the admission of a codefendant's incriminating statement did not warrant reversal where no defendant objected before or during trial or moved for severance. 705 F.2d 1237, 1243-44 (10th Cir. 1983).

From these cases, we conclude that cooperating with efforts to redact inculpatory statements and thereafter failing to raise an objection at trial does not per se waive a *Bruton* argument. However, as addressed in *Sarracino*, the record must show that the defendant intended to preserve the argument for appeal despite the cooperation and lack of an objection at trial. 340 F.3d at 1159. It follows then, that if the record does not show the defendant intended to preserve the argument, the argument is forfeited or waived. *See id.* For example, in *Sayedzada v. State*, the court of appeals considered waiver in the context of juror challenges for cause. 134 Nev. 283, 286, 419 P.3d 184, 189 (Ct. App. 2018). There, the defendant initially

challenged a juror for cause but thereafter did not renew the challenge, and the court considered the issue waived on appeal. *Id.* at 286, 288, 419 P.3d at 189, 190. In addressing the policy concerns supporting waiver under those facts, the court explained that "[p]arties should not be able to strategically place questionable jurors on the jury as a means of cultivating grounds for reversal should the verdict be unfavorable." *Id.* at 287, 419 P.3d at 190.

Our decision in *Jeremias v. State* offers additional guidance. 134 Nev. 46, 412 P.3d 43 (2018). There, the defendant argued that the district court's decision to exclude his family members from the courtroom during voir dire prejudiced him. *Id.* at 49, 412 P.3d at 47. But the defendant did not object to the decision in the district court, and we construed that failure as intentional. *Id.* at 52, 412 P.3d at 50. In so doing, we distinguished between invited error (an affirmative action by the defendant that introduces the error), waiver (an intentional relinquishment of a known right), and forfeiture, which from *Jeremias* can be described as the intentional failure to object, having full knowledge of the relevant facts. *Id.* at 52-53, 412 P.3d at 50. Specifically, we explained that the defendant forfeited his argument where the subject events happened in open court; the prosecutor relayed the reasons for his actions to the defense attorney; the defendant said nothing; and the decision to not object appeared, from the circumstances, to be intentional. *Id.* at 52, 412 P.3d at 50. Similar to *Sayedzada*, we warned against correcting errors on appeal where to do so, under the circumstances, "would encourage defendants who are aware their rights are being violated to do nothing to prevent it, knowing that they can obtain a new trial as a matter of law in the event they are convicted." *Id.*

From these cases, we extract the following rule: where the defendant moves to sever trial on *Bruton* grounds but the district court determines the statements can be sufficiently redacted, the defendant does not necessarily waive the *Bruton* challenge by thereafter participating in the efforts to redact the statements. Nevertheless, to clearly preserve a *Bruton* challenge for appellate review in this context, a defendant must formally object, on the record, after the parties have agreed upon redactions and prior to the district court's admission of a codefendant's statement. We note that determining whether a defendant preserves a *Bruton* argument for appeal is a highly fact-based inquiry that must be considered under the totality of the circumstances. Yet clarifying the objection on the record after a statement has been redacted by the court adequately preserves the objection for appellate review, as it clarifies that the defendant does not waive the argument and prevents unnecessary confusion. *Cf. BMW v. Roth*, 127 Nev. 122, 136-38, 252 P.3d 649, 658-59 (2011) (holding that the mere filing of a motion in limine does not serve as a continuing objection to an attorney's violation of an order in limine and that a contemporaneous objection is required at trial "to prevent litigants from wasting judicial, party, and citizen-juror resources").

Our holding here resolves two concerns. First, it recognizes that the law favors joint trials, *Jones v. State*, 111 Nev. 848, 853, 899 P.2d 544, 547 (1995), and encourages defendants to collaborate in redacting statements. Second, our holding prevents defendants from strategically withholding a *Bruton* argument in the hopes that, if the defendant is convicted, *Bruton* will provide grounds for a new trial following a reversal on appeal. *See, e.g.*, *Sayedzada*, 134 Nev. at 287, 419 P.3d at 190; *Jeremias*, 134 Nev. at 52, 412 P.3d at 50; *BMW*, 127 Nev. at 137, 252 P.3d at 659 ("The

courts cannot adopt a rule that would permit counsel to sit silently when an error is committed at trial with the hope that they will get a new trial because of that error if they lose." (quoting *U.S. Aviation Underwriters v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir. 1990))).

Turning to the case at hand, we conclude the record shows Turner waived his *Bruton* argument. Although Turner moved to sever trial and raised the *Bruton* argument below, Turner did not clarify, on the record, that he wished to preserve that argument for appeal after satisfactory redactions had been made by the parties. To the contrary, after Turner and the State agreed upon redactions, defense counsel acknowledged that Turner had no further challenge to the redacted statements, and nothing in the record shows that Turner renewed his objection before the admission of Hudson's statements. Under these particular facts, we decline to consider Turner's arguments or correct any *Bruton* error.

*Whether the district court erroneously admitted unnoticed expert testimony*

Turner next argues that the district court improperly admitted firearm and toolmark expert Anya Lester's unnoticed expert testimony regarding stippling. He further argues that the district court also improperly allowed Dr. Amy Urban, Turner's treating physician at UMC, to testify, where the State did not notice that expert. We generally review a district court's decision to admit expert testimony for an abuse of discretion. *Mathews v. State*, 134 Nev. 512, 514, 424 P.3d 634, 637 (2018). However, we address for plain error alleged errors raised for the first time on appeal. *See Browning v. State*, 124 Nev. 517, 533, 188 P.3d 60, 71 (2008) (holding that the failure to object below generally waives an argument on appeal, absent plain error).

We explained in *Hallmark v. Eldridge*, 124 Nev. 492, 498-99, 189 P.3d 646, 650-51 (2008), that district courts must ensure experts are sufficiently qualified before permitting the witness to testify as an expert:

> To testify as an expert witness under NRS 50.275, the witness must satisfy the following three requirements: (1) he or she must be qualified in an area of "scientific, technical or other specialized knowledge" (the qualification requirement); (2) his or her specialized knowledge must "assist the trier of fact to understand the evidence or to determine a fact in issue" (the assistance requirement); and (3) his or her testimony must be limited "to matters within the scope of [his or her specialized] knowledge" (the limited scope requirement).

*Id.* at 498, 189 P.3d at 650 (alteration in original) (quoting NRS 50.275).

Our statutes also require parties to disclose expert witnesses and provide a brief statement of the expected substance of the expert's testimony at least 21 days before trial. NRS 174.234(2). Further, each party has a continuing duty under NRS 174.234 to provide written notice of any expert or expert testimony the party intends to call or introduce during its case-in-chief "as soon as practicable after the party determines that the party intends to call an additional witness." NRS 174.234(3). Although the law favors allowing even late-disclosed witnesses to testify in criminal cases, *Sampson v. State*, 121 Nev. 820, 827, 122 P.3d 1255, 1260 (2005), courts should exclude an undisclosed witness if the State's failure to notice that witness or the content of the witness's testimony constitutes bad faith, NRS 174.234(3).

By mandating that parties disclose both the expert witness and the content of the witness's testimony, NRS 174.234 also serves to prevent trial by ambush. "Trial by ambush traditionally occurs where a party withholds discoverable information and then later presents this

information at trial, effectively ambushing the opposing party through gaining an advantage by the surprise attack." *Land Baron Invs., Inc. v. Bonnie Springs Family Ltd. P'ship*, 131 Nev. 686, 701 n.14, 356 P.3d 511, 522 n.14 (2015). We note NRS 174.234 is the criminal procedural rule equivalent to NRCP 16.1(a), which requires civil litigants to disclose expert witnesses and the content of the experts' testimony at least 30 days before trial. Such rules "serve[ ] to place all parties on an even playing field and to prevent trial by ambush or unfair surprise." *Sanders v. Sears-Page*, 131 Nev. 500, 517, 354 P.3d 201, 212 (Ct. App. 2015); *cf. R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (addressing the federal procedural rule requiring parties to disclose expert witness opinions and explaining that the reports must explain how and why the expert reached the opinion the expert intends to testify to, to avoid an ambush at trial).

*Anya Lester's stippling testimony*

During the State's case-in-chief, the prosecutor asked Lester "[w]hat is stippling?" She answered that stippling is "small marks that you could get on your skin if—if you're shot, you have a gunshot wound. And powder stippling in particular is if that powder hits your skin. You get, like, little scratches or bruises where that powder would impact your skin." The State then asked whether there was a particular range or distance associated with stippling, and Lester stated that it was difficult to give an exact number because of the variables involved. When the State asked whether she had ever seen a case of stippling from more than 24 inches away, Lester began to answer with "[i]n my limited experience with stippling," and Turner objected on grounds that Lester was not noticed or qualified to "talk about medical terminology and what may occur when a bullet impacts a human being."

SUPREME COURT
OF
NEVADA

(O) 1947A

14

Voicing concern over Lester's limited experience, the court conducted voir dire outside the jury's presence. Lester stated she had training on stippling and "distance determination from gunshot residue," primarily from a 2011 training that was not disclosed on her curriculum vitae (CV). She admitted to having limited experience with stippling and acknowledged the State asked her to look into stippling the day before she testified. Turner protested that Lester was only disclosed as a firearm and toolmark expert, not an expert on soft tissue damage to skin resulting from a gunshot. Turner asked for a continuance, which the court denied. The district court then allowed the prosecutor to ask Lester to define and explain stippling. Lester also opined that stippling happens at a close-to-intermediate range, and on redirect, she clarified that, in her experience, she had seen stippling occur "from a near-contact shot out to approximately 36 inches."

We agree with Turner that the district court abused its discretion in admitting Lester's stippling testimony. The prosecutor elicited the stippling testimony during the State's case-in-chief in violation of NRS 174.234(2)'s requirement that the State disclose the substance of any expert testimony it will offer during the case-in-chief. While the State noticed Lester as an expert in firearms and toolmarks, it did not notice her as an expert on stippling on human skin. Lester's CV did not mention that her training included stippling, instead focusing on her expertise in analyzing guns and matching expended bullets to firearms.[4] Accordingly, while the defense was on notice that Lester would try to match expended bullets to

_____

[4]The record shows that the State first mentioned the stippling issue to Lester the day before she testified.

firearms from the crime scene, the defense was not on notice that Lester would testify regarding any type of stippling on human skin from gunshot residue.

Moreover, we believe that the record shows Lester was unqualified as an expert under *Hallmark* to testify to the substance of the effect of stippling on skin. Lester explained that she had training regarding gunfire and gunshot residue. Lester's training with firearms and gunshot residue may have qualified her as an expert for purposes of defining stippling as it pertained to firing a bullet from a distance into a wall or other such surface as she testified to on voir dire; however, she was clearly unqualified as an expert in the area of testifying as to stippling of human skin from a gunshot wound. Here, the only relevance called into question by the defense was skin stippling as to Turner's gunshot wound. Because Lester admitted she had only limited experience in that area—and did not explain how her firearms training qualified her as an expert as to skin stippling—we conclude the district court erred by allowing Lester to testify as an expert as to skin stippling from gunshot wounds.

The problematic aspects of Lester's testimony do not end based on her being unqualified, however, as this situation can be fairly characterized as trial by ambush. Notice of the stippling evidence was important to the defense's preparation, where Turner's theory of the case was that Hudson alone was responsible for bringing the weapons to Clarkson's house and that no evidence placed any of the guns in Turner's hands during the crime. The skin stippling evidence, viewed in light of the

other evidence, strongly suggested Turner shot the SKS.[5] Allowing Lester to testify to skin stippling without notice effectively prevented Turner from preparing for cross-examination. It also prevented Turner from obtaining— or even consulting—a rebuttal expert.

Although Lester's stippling testimony is deeply troubling, we nevertheless conclude the error does not warrant reversal. Turner's own inculpatory statements placed him on or near the patio when the shooting started, and the unobjected-to medical records of Turner established the presence of skin stippling. Moreover, Dr. Urban's testimony, discussed further below, that stippling is caused by "gas and debris" from a gunshot, independently suggested Turner was close to one of the firearms at the time the shooting broke out. Accordingly, the errors here were ultimately harmless. *See* NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *see also Leonard v. State*, 117 Nev. 53, 69-70, 17 P.3d 397, 407-08 (2001) (reviewing improperly admitted testimony for harmless error where that testimony was "supported by other credible evidence").

*Dr. Amy Urban's testimony*

We next consider whether the district court abused its discretion by admitting Dr. Urban's testimony. Turner did not object below, and accordingly we review for plain error. *See Browning*, 124 Nev. at 533, 188 P.3d at 71 ("Generally, the failure to object precludes appellate review absent plain error.").

---

[5]Namely, other evidence showed that both the SKS and the Mossberg were shot at the same time, that Hudson shot the Mossberg, and that only Turner and Hudson were present during the crime.

The State called Dr. Urban after Turner asked the court to take judicial notice of the medical dictionary definition of stippling and the State disagreed with that definition.[6] Dr. Urban defined stippling and testified to Turner's medical treatment. Dr. Urban testified that Turner's wound showed stippling, which she defined as "little black marks that go around the skin of a wound from a gunshot wound. It's from high-pressure gas and debris." Turner's medical records, which the parties stipulated to admit, noted stippling to his lower leg, ankle, and foot, as well as shrapnel in his leg.

We conclude Turner fails to show plain error here. Turner's medical records were admitted into evidence before Dr. Urban testified, and those records listed Dr. Urban as Turner's treating physician and detailed the presence of skin stippling on Turner. Because Dr. Urban testified to medical records that were already admitted into evidence, her testimony relaying what was already in the medical records did not affect Turner's substantial rights. *Cf. Mitchell v. State*, 124 Nev. 807, 818-19, 192 P.3d 721, 729 (2008) (concluding the State's failure to notice an expert was not plain error where appellant did not show the testimony prejudiced his substantial rights); *Jones v. State*, 113 Nev. 454, 467-68, 937 P.2d 55, 63-64 (1997) (agreeing the prosecutor improperly questioned an expert against the

---

[6]We note Deputy District Attorney Giordani misrepresented to the district court judge that "we have our doctor [Urban], she's noticed." This was false. Although the State noticed Officer Robertson's treating doctors, the State never noticed Turner's treating doctors, nor did the State detail pursuant to statute Dr. Urban's expected testimony or that she would testify to the appearance of stippling around Turner's gunshot wound.

court's directive, but concluding the improper questions did not result in unfair prejudice in light of the evidence).

*Whether prosecutorial misconduct warrants reversal*

Turner raises numerous instances of alleged prosecutorial misconduct during closing arguments, which he argues cumulatively warrant reversal.[7] In evaluating claims of prosecutorial misconduct, we use a two-step analysis and determine, first, if the conduct was improper, and second, if the improper conduct warrants reversal. *Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). Harmless error does not warrant reversal, and if the defendant fails to object below, we review only for plain error. *Id.* at 1188, 1190, 196 P.3d at 476-77. Even if the errors individually do not warrant reversal, the cumulative effect of the errors may warrant reversal if they collectively violated the defendant's right to a fair trial. *See id.* at 1195, 196 P.3d at 481. "When evaluating a claim of cumulative error, we consider the following factors: (1) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged." *Id.* (internal quotation marks omitted).

We have carefully reviewed the record and agree there were multiple instances of misconduct.[8] First, the prosecutor invited the jurors

---

[7]Because Turner does not argue that the errors individually warrant reversal, we do not consider them individually for harmless or plain error. We note, however, that Turner failed to object to several of these errors below. *See Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (explaining the standard of review).

[8]We address only the statements that we conclude constituted misconduct. As to the remaining allegations of misconduct, we have reviewed the record and conclude the prosecutors' arguments were not improper in light of the evidence adduced at trial and Turner's admissions.

to feel "good" about convicting defendants who shoot police officers. Although Turner did not object to the prosecutor's argument, we agree it was improper, as these comments "appealed to juror sympathies by diverting their attention from evidence relevant to the elements necessary to sustain a conviction." *See, e.g., Pantano v. State*, 122 Nev. 782, 793, 138 P.3d 477, 484 (2006) (concluding that it was misconduct for the prosecutor to argue for the jury to find the defendant guilty in order to make the parents of the victim feel better, as making the parents feel better was not an element of the crimes charged). Furthermore, the prosecutor also improperly invited the jury to consider issues not in evidence by arguing the State could have charged Turner with additional crimes and implying the prosecutor believed Turner was guilty of additional, uncharged crimes. *See id.* (holding that it is "always improper" for the prosecutor to give a personal opinion regarding the defendant's guilt); *see also Valdez*, 124 Nev. at 1192, 196 P.3d at 478 (recognizing a prosecutor must "not inject his personal opinion or beliefs" into the trial). Next, the prosecutor disparaged defense counsel and the defense by arguing that there was no evidence of a third intruder and that Turner's defense that a third person committed the crimes simply "came into [defense counsel's] head," where eyewitness Grimaldi testified that he observed a possible third intruder. *See, e.g., Butler v. State*, 120 Nev. 879, 898, 102 P.3d 71, 84 (2004) (explaining that "[d]isparaging remarks directed toward defense counsel have absolutely no place in a courtroom, and clearly constitute misconduct," and that disparaging legitimate defense tactics is also misconduct (internal quotation marks omitted)). Finally, the prosecutor's argument that Turner knew Clarkson and Grimaldi were unarmed and therefore vulnerable amounts to prosecutorial misconduct because that argument was not

SUPREME COURT
OF
NEVADA

(O) 1947A

20

supported by evidence.[9] *See Williams v. State*, 103 Nev. 106, 110, 734 P.2d 700, 703 (1987) ("A prosecutor may not argue facts or inferences not supported by the evidence.").

Reviewing the above errors cumulatively, under these specific facts, we conclude that the errors do not warrant reversal. Substantial evidence implicated Turner. First, Turner admitted going to the residence with Hudson to do a "lick," i.e., to steal marijuana. He also admitted that guns were in the car, including the SKS, which he recognized as his uncle's gun, and he accurately described the SKS to detectives, although he denied using the firearm. Turner's dogs and cellular phone were found in the car located at the crime scene. The victims' detailed testimonies regarding the gunfire showed that two weapons were fired simultaneously. Significantly, despite the locations where both firearms were discovered, we note that the SKS had a trigger pull of approximately five pounds, and testimony adduced at trial sufficiently established that one person could not have fired both the automatic weapon and the rifle simultaneously. Evidence linked Hudson to the Mossberg,[10] supporting that Turner had fired the SKS. When officers found Turner nearby, he had shrapnel in his leg and stippling wounds.[11]

_____

[9]We also note the prosecutor's argument that the "only result" that can come from "shooting at two human beings" "is death" was inarticulate to the extent it suggested that shooting a gun could have no outcome other than murder.

[10]Hudson's fingerprints were on the Mossberg, Hudson's DNA was on a bloodied beanie found at the scene, and a victim testified that the person cocking the Mossberg was wearing a hat.

[11]While we acknowledge that the improperly admitted evidence was used to establish the distance at which stippling may occur, other properly admitted evidence nevertheless established the link between a gunshot and

Supreme Court
OF
Nevada

(O) 1947A

Finally, in Turner's statement to the police, he denied working with a third person, and his own statements placed him on or near the patio when the shooting broke out.

This evidence collectively supports that Turner intentionally went to the crime scene with the SKS to commit a violent crime and that he shot the SKS before dropping the gun and fleeing the scene. Accordingly, although there were several instances of flagrant prosecutorial misconduct, and although the charges here are grave, we conclude reversal is not warranted.[12] *See Valdez*, 124 Nev. at 1195, 196 P.3d at 480 ("This error . . . did not infect the trial with unfairness so as to affect the verdict and deny [appellant] his constitutional right to a fair trial.").

## CONCLUSION

Turner waived his *Bruton* argument below, and we therefore decline to address that argument on appeal. We agree the district court improperly admitted Anya Lester's expert testimony regarding skin stippling, but we conclude that error was ultimately harmless. Similarly, we agree that the prosecutor advanced several improper arguments during

---

skin stippling, and the jury could infer from that evidence that the stippling occurred because Turner was in close proximity to a gun when it fired.

[12]For the same reasons, we reject Turner's argument that the cumulative effect of all errors at trial warrants reversal. While we are deeply troubled by those errors, most notably the admission of Lester's testimony regarding skin stippling, and while the charges here are serious, we conclude cumulative error does not warrant reversal in light of the evidence against Turner. *See Valdez*, 124 Nev. at 1195, 196 P.3d at 481.

closing, but we conclude those statements do not rise to cumulative error warranting reversal under the particular facts of this case. Accordingly, we affirm the verdict.

_____, J.
Silver

We concur:

_____, C.J.
Pickering

_____, J.
Gibbons

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Cadish

SUPREME COURT
OF
NEVADA

(O) 1947A